Filed 4/26/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S110294 |
| v. | ) | |
| | ) | |
| JAMES ANTHONY DAVEGGIO and | ) | |
| MICHELLE LYN MICHAUD, | ) | |
| | ) | Alameda County |
| Defendants and Appellants. | ) | Super. Ct. No. 134147 |
| _____ | ) | |

Defendants James Anthony Daveggio and Michelle Lyn Michaud were each convicted of one count of first degree murder (Pen. Code, § 187, subd. (a)), two counts of oral copulation in concert by force (*id.*, § 288a, subd. (d)), and one count of oral copulation on a person under 18 years of age (*id.*, § 288a, subd. (b)(1)).  Daveggio pleaded guilty to the oral copulation counts before trial; the remainder of the convictions stemmed from the jury's verdict.  The jury also found true two special circumstances—kidnapping and rape by instrument (*id.*, § 190.2, subd. (a)(17)(B), (K))—and returned verdicts of death at the close of the penalty phase.  The trial court denied the automatic motions to modify the verdicts (*id.*, § 190.4, subd. (e)) and sentenced defendants to death.  This appeal is automatic. (*Id.*, § 1239, subd. (b).)  We affirm the judgment.

## I. BACKGROUND

This case arises from the kidnapping, rape by instrument, and murder of Vanessa Lei Samson; the forcible oral copulation of Sharona Doe; and the oral

1

copulation of minor April Doe.  At trial, the prosecutor also adduced evidence of four uncharged sexual offenses.

### A.  Guilt Phase

#### 1.  Prosecution case-in-chief

##### a.  Defendants meet, move in together, and are evicted

Defendants met in 1996.  Within a few months of their meeting, Daveggio moved into the tri-level Sacramento home in which Michaud was residing.  They lived there together until August 1997, when Michaud was evicted.  Following the eviction, defendants began living out of Michaud's green Dodge minivan.  The minivan had a sliding passenger-side door with a childproof lock, as well as removable back and middle seats.  At some point, defendants removed the middle seats.

##### b.  Christina Doe incident (uncharged)

Janet and Ted Williams, who were acquainted with defendants, permitted defendants to stay in their home for a few nights in September 1997.  On September 11, after that stay had concluded, Janet and Ted left town for a few days.  They later discovered that the screen behind their bathroom window was bent in a manner that appeared consistent with a break-in and that their shower had been used.  On or after September 14, Michaud confessed to Janet that she had broken in through the bathroom window and stayed in the house with Daveggio.[1] The first uncharged sexual offense occurred during this time period.

---

[1]     The trial court admitted several pieces of evidence against only one of the defendants; this evidence was admitted only against Michaud.  Because none of our analysis depends on using evidence limited to one defendant against the other, we do not separately identify each instance in which evidence was admitted as to only one defendant.

The offense involved a close friend of Michaud's daughter, Rachel Doe. In mid-September 1997, Rachel was 12 years old, around three months shy of her 13th birthday. Her friend, Christina Doe, was then 13 years old, and lived near the tri-level. Christina had known Michaud since Christina was four years old, and sometimes spent time with Michaud when Rachel was not present. By mid-September 1997, Christina had also been acquainted with Daveggio for roughly nine months.

One night in September, Michaud knocked on Christina's door. Christina testified that Michaud invited her to go run some errands. They left together in the green minivan, eventually pulling up to and entering a house that Christina had never visited before. According to Janet Williams, Christina's later description of the house's floor plan appeared to describe the layout of Williams's home.

Christina and Michaud entered the residence. When they did, Christina saw Daveggio sitting on the couch. He was watching a television program about mobsters and at some point told Christina that he collected "like baseball cards of serial killers." Michaud was in the room at the time of the comment. When she later stood up and walked into the kitchen, Daveggio followed almost immediately. Defendants used methamphetamine in the kitchen and urged Christina to do the same, notwithstanding her protestations. After Christina snorted the drugs, Michaud took Christina's arm and said she had to speak with her in the restroom.

Once inside the restroom, Michaud locked the door. Michaud told Christina that "she wanted to party with" Christina. When Christina said no, Michaud took a handgun from her pants and put it on the counter. Michaud told Christina, "Don't worry, it is just for protection"—but then told Christina to take off her clothes. When Christina refused, Michaud removed Christina's bra and licked her chest. When Christina refused to take off the rest of her clothes,

3

Michaud undressed her, opened the door, and guided her out. She told Daveggio that Christina was his "present."

Daveggio did not look surprised. He walked toward Christina, moved her toward a bedroom, and began to kiss her, as Michaud removed his pants and licked his anus. Daveggio then orally and digitally copulated Christina while Michaud masturbated. When Daveggio stopped, Michaud orally copulated him, told Christina to do the same, and, when Christina refused, attempted to force Christina to do so. Daveggio then raped Christina for roughly 15 minutes while Michaud licked his anus. Eventually Michaud returned to the bathroom with Christina and instructed her to bathe. Christina testified that while they were getting dressed, Michaud told her "that if I told anybody that she would kill me."

### c. Aleda Doe incident (uncharged)

A few weeks after the Christina Doe incident, defendants visited a pawn shop in Reno, Nevada—Daveggio on September 28, Michaud on September 29. Aleda Doe was a 20-year-old student attending night school in the same city. The night of September 29, around 10:00 p.m., Aleda began to walk home after class. Roughly 10 minutes later, a dark-colored van with a light stripe stopped alongside her. A man she later identified as Daveggio grabbed her, pulled her inside, and closed the van's sliding door.

The driver was a thin, pale-faced woman with darker-colored, shoulder-length hair. Daveggio gave directions to the driver and told Aleda "to stay quiet and not to say anything." After groping various parts of Aleda's body, Daveggio instructed Aleda to get undressed. Afraid, she partially disrobed; he took off her bra. Daveggio then sexually assaulted her. At some point during the assault, Aleda tugged on the driver's hair to seek help. The driver ignored her.

4

After the sexual assault, Daveggio asked Aleda if she was sexually interested in women and wanted the driver to come to the back of the van. Aleda did not respond. At some point, the driver put in a cassette tape and began singing with Daveggio. Daveggio explained to Aleda, a non-native English speaker, that the song was about "a man from Reno or a man in Reno that killed another man just to see him die." Daveggio denied that he had ever killed someone for that purpose and denied having a gun with him at that time. He also told Aleda that they could not return her to Reno because he had kidnapped her and was worried about going to jail.

Aleda attempted to elicit information from the driver. The driver was defensive and told Aleda that she was asking too many questions. Aleda noticed, however, that at some point Daveggio had called the driver "Mickey." Other witnesses testified that Mickey was one of Michaud's nicknames.

Aleda also heard Daveggio ask the driver, "So, what do you think? Should we go ahead and go with the plan?" The driver requested 10 minutes to think about it. Daveggio then asked the driver what she wanted to do, and said he would leave the decision up to her. The driver pulled off the freeway and told Aleda to get out of the van. While Daveggio switched into the driver's seat, Michaud told Aleda to count to 20 and to not look back. Aleda complied. Aleda was eventually able to contact the police, who took her to a hospital at which a nurse collected samples from her face and neck. At a later date, Aleda identified Daveggio in a photo lineup. Aleda did not identify the driver, but described her as named Mickey.

At trial, the court advised the jury that in connection with this incident, Daveggio was convicted in federal court of kidnapping, conspiracy to commit kidnapping, and aiding and abetting a kidnapping; and Michaud was convicted of

5

kidnapping and aiding and abetting a kidnapping. "Both defendants," the trial court instructed, "received substantial prison terms for these convictions."

After those judgments of conviction were rendered, DNA testing was conducted on the samples the nurse collected from Aleda. Material included in some of the samples was consistent with Daveggio's DNA; the "particular profile of nine genetic markers" at issue was only "found in approximately one in 510 billion Caucasians."

### d. Rachel Doe incident (uncharged)

Michaud's daughter Rachel had a boyfriend. After Michaud was evicted, she asked the boyfriend's mother if Rachel could stay at the mother's home. The mother obliged.

One morning, a few weeks after the Aleda Doe incident, Michaud appeared at the mother's house. Michaud told Rachel that she wanted to spend time together before defendants left for Oregon to look for a new place to live.

After spending a few hours at the home of one of Michaud's friends (where methamphetamine was present), Michaud invited Rachel to join the road trip to Oregon. Rachel accepted the invitation. During the drive, she fell asleep on the back bench seat. She testified that when she awoke, Daveggio massaged her inner thigh, and "started to move up to the top of [her] pants like he was going to try to go inside" them. Rachel moved his hand away and went up to the front passenger seat. While she spoke with Michaud, Daveggio attempted to massage Rachel's shoulder as Rachel "kept trying to push his hand off."

The van eventually reached a shop with a bathroom. Rachel entered the bathroom with Michaud and told her what had happened. Rachel testified that Michaud "assured me, she was like: yes, I will tell him to stop, I will have a talk

6

with him about it." When they returned to the van, Michaud had a conversation with Daveggio that Rachel could not hear.

The trip resumed. As before, Michaud was driving, Rachel was in the passenger seat, and Daveggio was in the back. "Out of nowhere," Rachel testified, Michaud "started telling me pretty much that she has had sex with everybody I know. . . . She told me that I was her secret lust." "She told me that I was like her fantasy. And she told me that I was going to be an adventure. . . . She said that . . . they had had adventures in Reno, and . . . that Christina was one of their adventures, and that I was going to be the next one. . . . She told me that . . . when I used to get high off marijuana and pass out that she would orally copulate me and that she liked it best when I was on my period because she liked the taste of my blood." When Rachel dropped a beverage, Michaud added: "See, you are getting wet just thinking about it."

Michaud said she was going to pull over so they could have a talk. Rachel objected. Michaud pulled over. When Rachel reached for her tennis shoes so she could try to run away, Michaud locked the doors. Rachel tried to kick the window, but Michaud "jumped on top of" her and Daveggio made her seat recline. Michaud told Rachel that she could "go along with it willingly or they were going to take it from" her.

Michaud straddled Rachel and unfastened Rachel's pants. Daveggio restrained Rachel while Michaud digitally copulated Rachel. More than once, Rachel said, "Mommy, stop."

Daveggio tugged Rachel into the back of the van. Defendants pulled Rachel's pants down and Daveggio orally copulated her. Rachel was "screaming, crying, trying to fight." Meanwhile, Michaud licked Daveggio's anus and eventually masturbated.

7

Rachel later cried herself to sleep. She awoke outside a motel. The trio went inside, and Rachel fell asleep in one of two beds. When she awoke the next morning, Rachel testified, Michaud was next to her on the bed, naked. Michaud asked if Daveggio could have intercourse with Rachel. Rachel said no. Defendants then duct taped Rachel's mouth from ear to ear, took off her pants, and duct taped her hands behind her back. Daveggio began orally copulating Rachel. Michaud masturbated while wiping Rachel's tears. Eventually, Michaud told Daveggio, "Okay, James, you can stop now." He stopped. Michaud then engaged in sexual activity with Daveggio on another bed. Roughly half an hour later, after Rachel shook her head to indicate that she would not scream, Michaud took the duct tape off Rachel's mouth and hands. Before they left the motel that night, Daveggio shaved his head, purportedly so that a motorcycle gang looking for him would not recognize him.

They eventually traveled to Christina's house. Christina saw red marks and black lines around Rachel's cheeks, mouth, and wrists. Rachel looked scared. Christina agreed to travel with Rachel and defendants to Santa Cruz because, Christina explained, "I felt if they did anything to her that they did to me, I don't think I would want to be alone either." On the way back from Santa Cruz, Daveggio drove into a wooded area, pointed a gun out the window, and shot it. Rachel held Christina's arm, afraid that defendants were going to kill them. Christina understood Daveggio's conduct to be a threat indicating that she and Rachel should keep quiet. Daveggio then drove back on the freeway. According to Rachel, at some point between her first assault in the van and the return from Santa Cruz, Michaud "said that if we ever told anybody that they would track us down and kill us."

8

*e. Amy Doe incident (uncharged)*

The incident involving Amy Doe occurred within a few weeks of the incident involving Rachel, sometime around November 1 through 4, 1997. Amy was then addicted to methamphetamine, which she believed she used at least every other day.

Amy was at the home of an acquaintance of hers and Michaud's. Michaud came over and said she was upset with Daveggio and wanted to go for a drive. They got in Michaud's van and went to a motel room that Michaud said she needed to be in to receive a call. There, they talked for what Amy estimated was 15 or 20 minutes, during which Michaud complained about Daveggio, cried, and put her head in Amy's lap. Amy was then hit on the back of the head with an object that felt to Amy like a gun. Amy was dazed. As she came out of the daze, fighting and screaming, Daveggio handcuffed one of her wrists and punched her in the face. Amy's mouth started bleeding. Defendants both angrily and repeatedly told Amy "to shut up." Amy testified that "it seem[ed] like [Daveggio] told me to shut up or else I would die." After she was punched, someone cuffed her other wrist. Around that time, Amy felt a gun put to her head, heard a click, and heard Daveggio say, "Damn, it jammed."

Amy was cuffed behind her back. Michaud blindfolded her. Amy continued resisting. One of the defendants put duct tape on Amy's mouth, although it did not stick well because of the blood.

Amy ended up facedown on the bed, at least initially. Michaud cut off Amy's shirt and bra, also pulling off Amy's shoes, pants, and underwear. Michaud orally copulated Amy, then Daveggio sexually assaulted Amy with Michaud's help. Eventually, someone removed the handcuffs and the blindfold and Michaud slowly removed the duct tape. Both defendants, Amy testified, "told me that if I said anything I would die."

9

Amy estimated that she was in the motel room for at least six or seven hours, part of which Michaud spent laundering bloody linens. While Michaud was out of the room doing laundry, Daveggio told Amy "that it was all [Michaud's] idea."

Before taking Amy back to the acquaintance's home, defendants went to the welfare office. Michaud went inside, leaving Amy in the van with Daveggio. When she returned, she informed Amy that she had already told their mutual acquaintance that Amy had become intoxicated at a bar, fallen, and injured herself. The last thing defendants told Amy before they let her go, Amy said, was "[t]hat if I told anybody I would die." Defendants returned to the same house roughly four days later. As Michaud was leaving, Amy testified, "[Michaud] said: I see you didn't tell. And [Amy] said: I'm still alive." Amy did not mention the incident to law enforcement until around December 2000.

### f. Sharona Doe incident (counts 1 & 2)

Sharona Doe knew Daveggio through her two best friends: Daveggio's daughters April and Jamie. April had spent some time living in the Sacramento tri-level with defendants. When visiting April, Sharona met Michaud. At the house, Sharona had used methamphetamine provided by Daveggio.

On November 3, 1997—around the same time as the attack on Amy Doe— Sharona was working the night shift at Q-Zar, a laser tag arena in Dublin, California. She "hadn't done drugs for a few days." While Sharona was taking a cigarette break, defendants pulled up in the van, parked, and walked over to speak with her. Daveggio offered her methamphetamine. Sharona accepted the offer, and proposed consuming the drug in the Q-Zar bathroom. Defendants, she testified, "didn't like that idea," so they "went over to the van" instead.

Michaud got in the back seat. The middle seats were not in the van. Michaud pretended to chop up the methamphetamine on a mirror and knocked the mirror over, pretending to spill the drugs. "[S]he sent me over there," Sharona testified, "so I could see if there was anything there."

Sharona did not see anything resembling methamphetamine. When she began turning around, Michaud attempted to push her down. By that time, the sliding door was closed. Sharona fought off Michaud, but Daveggio came back from the driver's seat and hit Sharona.

Sharona retained consciousness, but was dazed. When she was able to orient herself, she realized that defendants were restraining her. Daveggio applied handcuffs behind Sharona's back. At least one of the defendants bound Sharona's legs. Sharona was struggling and crying. Daveggio remained in the back seat with her, while Michaud moved the van to the bowling alley across the street from the Q-Zar. Daveggio "started yelling at [Michaud] how it was a stupid place to be," Sharona testified, and Michaud drove onto the freeway.

While on the freeway, Sharona complained that the cuffs were causing her pain. Daveggio removed them. Daveggio told Sharona to orally copulate him. She complied, crying. The oral copulation lasted for roughly two and a half minutes. Daveggio told Michaud to exit the freeway. She did, pulling into a residential area and parking next to a field. Sharona testified that Daveggio "started complaining about how that was a stupid spot also. Then [Michaud] started driving again and we parked in front of like a bunch of big houses." Michaud moved to the back seat. Daveggio told Sharona that the sliding door was locked and she could not open it. He also informed Sharona that Michaud was "going to have her turn." Michaud removed Sharona's pants and orally copulated Sharona for roughly 20 minutes while Daveggio watched, masturbating.

11

Sharona was still naked from the waist down.  Daveggio photographed her.
He told her that if she "ever told anybody that he would show the picture to
everybody."

Daveggio took the wheel and headed for the Q-Zar.  Defendants "began
talking about how they wouldn't be able to let [Sharona] go because [she] knew
who they were."  At some point during the incident, both of them threatened to kill
her.  Sharona was frightened.  She assured defendants that if they released her, she
would fabricate a story to tell the police.  Apparently to further that story, Michaud
tore Sharona's shirt.

Defendants ultimately released Sharona at a gas station a block away from
the Q-Zar.  When they did, Daveggio flashed a gun.  Sharona called one of her Q-
Zar coworkers for help.  The coworker picked her up.  When they returned to the
Q-Zar, police were present.  Sharona told them the fictional story—"something
about three guys"—"because [she] was still scared."

Two law enforcement officers testified about their interactions with
Sharona that night.  One observed that Sharona did not appear to be under the
influence.  Another, Sergeant Michael Hart, "noticed marks around both wrists"
consistent with Sharona's having been handcuffed.  Hart was suspicious about
Sharona's "three guys" story, having observed "several inconsistencies" between
the version Sharona told to him and the version Sharona told to the other officer.
Sharona repeated the story about "three guys" kidnapping her the next time she
and Hart spoke.

After defendants were arrested, Sergeant Hart spoke with Sharona a third
time.  Sharona told Hart that she had lied to him earlier, and defendants were her
actual assailants.  Sharona explained that she lied because defendants "were out on
the streets," and indicated that she would press charges if she could be sure
defendants would not be released from jail and able to harm her.  Sharona later

12

admitted to a grand jury that she had initially lied to the police. When asked why, she testified, "Because [defendants] were still on the streets and because they were my best friends' dad and my best friends loved their dad, or I thought they did, and I thought that would really hurt them."

### g. *Defendants stay with Michaud's sister and Rick Boune*

Michaud had an older sister, Misty. Misty's boyfriend was Donald "Rick" Boune. Boune and Misty moved into a new home around November 1, 1997. Not long after, defendants stayed with them for a few days. Boune sometimes used drugs with defendants, including during that visit. By the time of the visit, Michaud's green van had a stripe on its side. At some point, Boune had seen a crossbow inside of it.

One night, Boune and Misty were in their front room with defendants. Michaud appeared to be reading a book called "The Sex Slave Murders." The movie *The Silence of the Lambs* was on the television. When the movie came on, Boune testified, Daveggio volunteered that "he had read every book written on any documented serial killer published." Daveggio said that "out of all the serial killers that he read about, the one that he admired the most was Gerald and Charlene Gallego[]." Daveggio added "that if he was ever going to be a serial killer, he would be just like Gallegos."[2] During this conversation, Michaud had serial killer trading cards; the top card was of the Gallegos. Michaud said "that if they were ever to do anything like that, it would be—they would have a card like that, she would have a card like that."

---

[2]     Gerald Gallego was convicted of capital murder and sentenced to death after he and his wife Charlene kidnapped and murdered a Sacramento couple. (See *People v. Gallego* (1990) 52 Cal.3d 115, 140–141.) At the penalty phase of his trial, the prosecution presented evidence that he had abducted and killed two other women (one of whom he placed on a bed in the rear of his van) and that he had sexually abused his daughter. (See *id.* at pp. 154–155.)

Defendants stayed the night.  The next morning, they had an argument. Boune saw Daveggio point a gun at Michaud's head and threaten to shoot her. Daveggio eventually left; Michaud stayed the night.  When Daveggio returned the next morning, Michaud seemed "very happy."  Defendants stayed one more night and then departed, leaving some of their belongings (including a semiautomatic gun) at Boune and Misty's house.

### h. *Christina and Rachel speak with the police*

Christina's father eventually contacted the police, as did Rachel's maternal grandfather Leland.  Christina and Rachel spoke with the police sometime after November 15, 1997.  Rachel placed a pretextual phone call to Michaud, attempting to elicit a confession.  Michaud told Rachel, "Do you think I am stupid?  I know what you are trying to do.  I am not going to say anything over the phone."

Around two weeks after defendants left Misty and Boune's home, Michaud returned to retrieve her belongings.  Her father Leland was there when Michaud arrived.  When Michaud pulled up in the van, Boune testified, Leland told Michaud that the police were looking for defendants "for what they had done to Rachel and Christina."  Michaud denied doing anything to the girls.

### i. *April Doe (count 3)*

As noted, Daveggio's daughter April lived for at least some amount of time in the Sacramento tri-level with defendants.  By February 1997, she had moved in with her mother and stepfather, Annette and Chris Carpenter, in Dublin, California.  Her sister Jamie lived with them.

Thanksgiving fell on November 27 that year.  Defendants were in town as of a week or so before.  They spent several nights in hotels in the area.  Twice before Thanksgiving, April and Jamie stayed with one or both defendants at the

14

Candlewood Inn.  Around that time, April, then 16 years old, was using methamphetamine every day.  Daveggio provided her with "a lot" of it.  While staying at the Candlewood, April did not sleep at all.

Defendants joined the Carpenter family for a Thanksgiving meal.  Jamie testified that when they drove from the Candlewood to the Carpenters' that morning, the only seats in the car were the driver's seat and front passenger seat; the back bench had been removed.  While at the house, April testified, she and Daveggio were together in her room with the door open.  Daveggio had a small, automatic handgun that, according to April, he was "caressing" "like it was his baby."

April returned to the Candlewood with defendants that night "[b]ecause they were going to take me to [the] DMV on Friday to get my license."  This time, it was just the three of them.  Jamie testified that she "started to go but [Daveggio] said it was better if I just stayed home."  While at the Candlewood, April testified, she and Daveggio "talked about lots of things," including "the perfect way to rob an armored truck."  He also asked April if she "wanted to go on a 'hunting' with him," which, April testified, Daveggio described as "where you stalk someone to kill."  April and Daveggio also "talked about fear in people's eyes"; according to Daveggio, "it was an adrenaline rush."  "Looking at you," he told April, "reminds me of me, you show no remorse."  April testified that Daveggio "explained that you can't have feeling[s] for anyone, that if, for instance, my sister Cassie seen him do something that he would have to kill her, too. . . .  He wouldn't care.  He said you can't have feelings. . . .  [Y]ou can't care about people like that."

Daveggio also mentioned that serial killers do not show remorse; they can just "go on with their everyday life and no one would know what they had done."  Daveggio had studied serial killers' flaws and "knew how to get away with it."  He had also given April a book called "Serial Murderers" while living at the

15

Sacramento tri-level. The book "meant a lot to him," April testified; "he didn't want me to lose it." April had read about Henry Lee Lucas in the book, a man who "had a girlfriend that used to lure women and they killed a lot of people." April asked Daveggio if he had ever killed anyone; Daveggio told her that "he wouldn't tell [her] if he did or not because he never wanted [her] to have to lie for him."

The conversation lasted around two hours. At the end of it, Daveggio took a roughly 20-minute shower. While he was showering, Michaud sat next to April. April testified that Michaud told her—without conferring with Daveggio—that Daveggio was "going to have oral sex with" April when he finished his shower. "[Michaud] said that [she] thought [April] would feel better if [April] knew."

April was frightened and did not know what to do. After Daveggio finished his shower, he sat on the bed and told April to sit next to him. She complied. He told her that he loved her, and then started to touch her on the outside of her clothing.

April said no. Daveggio told her "not to worry," that she would "enjoy [her]self." Michaud went to the bathroom and closed the door. Daveggio removed April's pants and underpants. He kneeled on the floor and orally copulated April for about an hour, while she cried. About 15 or 20 minutes before the hour ended, April testified, Michaud returned from the bathroom, "layed on the floor and gave my dad head." Daveggio eventually stopped.

Testimony of a Candlewood employee indicated that defendants checked out that morning, November 28. Defendants took April back to the Carpenters'. Michaud cornered April in the Carpenters' laundry room. April explained: "She was trying to talk me into going on a hunt with them . . . . She told me that the day after Thanksgiving was the biggest shopping day of the year and it would be a

16

perfect day to find someone to kill." April declined; Michaud became angry. "She told me that we would have to go soon."

April was with her boyfriend later that day. When they became intimate, April became upset and started crying. She told him what defendants had done. April's boyfriend testified that April broke down crying and told him that defendants had molested her.

### j. Events between the April Doe and Vanessa Samson incidents

On November 30, defendants checked into a Motel 6 in Pleasanton. Testimony indicated that at 6:51 p.m. that day, they purchased two curling irons from a Kmart in Hayward.

On December 1, defendants shopped at an adult entertainment store in Livermore called "Not Too Naughty." They purchased a cassette tape called "Submissive Young Girls" and a ball gag.

Elsewhere, that same day, Aleda Doe identified Daveggio to an FBI agent, selecting Daveggio's picture from a photo array. On December 2, in connection with Aleda's identification, a federal warrant issued for Daveggio's arrest.

Also on December 2, defendants' reservation at the Motel 6 in Pleasanton concluded. The time of their departure was not recorded. Vanessa Samson disappeared that day.

### k. Vanessa Samson incident (count 4)

Vanessa Samson lived with her parents and siblings in Pleasanton. She worked for an insurance company about a mile from their home, and usually walked to the office. Samson had never failed to appear for work; she was due in at 8:00 a.m. and would generally arrive around 10 minutes early. On the morning of December 2, her mother said goodbye to her sometime between 7:20 and 7:45 a.m.

17

That morning, two men were working on a roof overlooking a street on Samson's route to her office. Both men heard a scream—and the sound of a van door sliding shut. One testified that it was then around 7:30 a.m. Both men saw a forest green van driving away slowly. Though neither witness saw a stripe on the van, one observed that the van had a light-colored California plate whose first character was the number three. The other saw that the driver was a woman with shoulder-length brown or black hair.

Later that morning, at around 9:45 a.m., Michaud was seen at a welfare office in Sacramento. A witness placed her at a nearby check-cashing facility around 20 minutes later. That same day, an employee at a recreation area between Sacramento and Lake Tahoe spotted a dark green "Dodge Caravan or Plymouth Voyager type vehicle" "parked in campsite number 9." The vehicle had an approximately "five-inch wide silver, white-colored stripe that ran down the side of the vehicle below the windows." The witness also saw a "slightly overweight" white male outside the van smoking cigarettes and a white female with "longish brown hair" inside of it. The witness believed the man saw him, and he testified the van left within about five minutes after that.

The witness explained that the recreation area had "a self-service pay station where you fill out your information, your vehicle, people that are staying with you and various things. You put your money in the envelope pertaining to what type of service that you're going to be doing with the facility and you place that into a metal canister." An FBI agent later recovered torn-up pay envelopes from the hotel room in which Michaud was arrested. The envelopes provide the license plate number of Michaud's van; indicate that the van was parked in campsite #9 at Sly Park Recreation Area on December 2, 1997; and bear the name "James Allen." The field for "# People" is blank on one of the envelopes. The other, however, lists the number of people in the van: "3."

18

A different witness placed defendants at a motel in Lake Tahoe that same day. The owner-manager of the Tahoe Sundowner Motel testified that a man with a green van registered under the name Daveggio and gave a Sacramento address that corresponded with the tri-level. The man requested a smoking room. Within about half an hour, the witness saw a "white female with black hair" drive the van off the premises; she returned within about 15 or 20 minutes. Later that night, the room's windows were fogged, as though someone had taken a long shower. The lights were on, and the drapes were closed, but the van was gone. The next morning at check-out time, the witness entered the room. Aside from a "very light coffee stain" on the bedspread, the room was "nice and clean, just like they spent only maybe [a] few hours." Even "[t]he trash can was empty"; the liner had been removed.

That same day, another witness placed defendants at the Lakeside Inn and Casino, across the street from the Douglas County Courthouse in Nevada. At 7:19 p.m., a desk clerk checked in a customer named James Daveggio. The clerk confirmed the name against Daveggio's picture identification and recorded his driver's license number. Daveggio may have been accompanied by a woman with "dark hair, dark complexion."

A former deputy district attorney in Douglas County, Nevada, testified that in November 1997, he had handled a case in which Michaud was accused of passing bad checks. The attorney helped set up a future court date: December 3, 1997. He spoke with Michaud in the courthouse the morning of December 3, before 11:00 a.m. Michaud appeared to be "at ease and very cooperative," not distressed.

Meanwhile, back in California that same day, FBI agents visited Misty and Boune's home. (Recall that a federal warrant had issued for Daveggio's arrest the

19

day before, in connection with the Aleda Doe incident.)  Boune told the agents that Michaud was scheduled to appear for court in Lake Tahoe.

Back in Nevada, defendants were at the Lakeside Inn and Casino.  FBI agents arrested Daveggio on the casino floor at around 6:35 p.m.  Around the same time, Michaud was arrested on a state warrant in one of the guest rooms.  Items found inside the room included the Sly Park pay envelopes, torn into a few pieces, and a cash box containing both a small semiautomatic pistol and baggies with white powder.  A roughly 36-inch piece of yellow nylon rope was recovered from Michaud's pocket.  The green van was seized and secured.  Its plate number began with a 3.

The next morning, a passing driver found Samson's body lying in the snow on the side of the road.  A deputy sheriff arrived, and after inspecting the body, found no signs of life.  The body seemed to be frozen and had "what appeared to be a ligature type mark surrounding the neck."  From the area near Samson's body, the deputy recovered a black rope with human hair on it.

### l. Autopsy

Dr. Curtis Rollins performed an autopsy, but did not testify during the prosecutor's case-in-chief (though he did later testify during the prosecutor's rebuttal).  During its case-in-chief, the prosecutor called forensic pathologist Brian Peterson.  Dr. Peterson relied on Dr. Rollins's autopsy report, a toxicology report, and some black-and-white photographs to conclude that "the cause of death, as Dr. Rollins stated, is mechanical asphyxia due to ligature strangulation.  [¶]  All I would add to that is that I think there was also an aspect of manual strangulation.  But in any event, the cause of death is asphyxia."  Peterson also described deep bruising on Samson's gluteus maximus.  He also noted that there were no physical indications that Samson's extremities had been restrained, but testified that it is

20

possible for a restraint to be applied to someone's wrists and ankles without leaving a mark.

On cross-examination, Peterson conceded that he could not exclude the possibility that Samson had been "asphyxiated to the point of unconsciousness," left on the side of the road, and had frozen to death. He also testified that Rollins's report did not describe any trauma to Samson's vaginal or rectal area. Rollins, Peterson added, had problems with substance abuse; other testimony indicated that Rollins had a problem with Demerol, which can "affect one's ability to attend to detail."

*m. Evidence in the van*

The van was searched. A "Submissive Young Girls" tape was retrieved from the van's cassette player. A crossbow was in the back. Among other things, agents found a white towel on the right front passenger floorboard. Wrapped inside the towel were "one Revlon item with silver color [duct] tape on it, . . . one leather-type [braided] black belt, one [bunch of] white tissue with red stains on it, one yellow nylon-type rope, one green ball [gag], and one roll of duct tape." The Revlon item appeared to be a curling iron. A second curling iron was recovered from elsewhere in the van. Both curling irons were modified: the electrical cords were cut off; "[t]he clasp, metal clasp that is used to help curl your hair, was removed"; and "there was duct tape around the middle portion of it where . . . the clasp area [appears to] connect[]."

Forensic testing was done on some of the evidence recovered. Fingerprinting suggested, among other things, that Daveggio had touched the cash box, Michaud had touched a curling iron, and Samson had touched a cup found inside the van. Swabs of a curling iron and the ball gag were subjected to DNA testing. An expert concluded that Samson's DNA was present.

21

Criminalist Brian Burritt also testified. Among other things, Burritt examined the second curling iron for biological material. He found "brown material in the grooves of the tip of the curling iron" and "on the interior of the tip of the curling iron." Packed inside the curling iron, occupying roughly the bottom half of the 3/4" deep tip, was a pellet of brown material. The pellet, along with swabs taken from the tip of the curling iron, tested presumptively positive for blood. Although he could not say to a scientific degree of certainty that the material was fecal matter, it appeared to be and had the characteristics of fecal matter. Burritt also observed at least three sets of bite marks on the ball gag. DNA testing of swabs taken from the curling irons, from the ball gag, and from napkins found in the van were all consistent with Samson's DNA profile.

### n. Additional evidence

Testimony indicated that before departing for Lake Tahoe, defendants left several of their belongings at the Carpenters' house. Items recovered included a crossbow; a book entitled "Sex Slave Murders"; and a set of serial killer trading cards, which included a card for Charlene and Gerald Gallego.

### 2. Defense cases

Daveggio rested without calling any witnesses. Michaud called Dr. Gregory Reiber, an expert in the area of forensic pathology. Reiber testified that, in his view, Rollins, who had conducted the autopsy of Samson, had a "serious substance abuse problem." Reiber called into question Rollins's and Peterson's conclusion that the cause of death was asphyxiation. Although Reiber acknowledged a "strong possibility" that Samson died from asphyxiation, he thought it was possible that she died from exposure, and did not think it was reasonably medically certain that asphyxiation caused her death. On cross-examination, he conceded that no clinical observation indicated that Samson froze

22

to death, though he would not have expected otherwise, since hypothermia is "a diagnosis of exclusion." Reiber also acknowledged that an absence of vaginal or rectal trauma does not mean that someone was not assaulted in that area, adding that in roughly 60 percent of forcible sodomy cases, no anal trauma is visible. When asked specifically whether he would "expect to find signs of trauma if that organ were penetrated by a hard metallic object," he responded, "[i]n many situations I would. It really depends on the size of the object and the way in which it is used."

Michaud also called Dr. Pablo Stewart, "an expert in the area of psychiatric treatment of alcohol and drug abuse and posttraumatic stress syndrome." He testified that Michaud, who had been a prostitute, who was allegedly abused by her father, and at whom Daveggio had waved a gun, suffered "from complex posttraumatic stress disorder" and that she had a propensity to be "controlled by someone else in a relationship."

Several friends or acquaintances of Michaud also testified. One testified to incidents suggesting a troubled relationship between Rachel and Michaud. The witness testified that, on one occasion, Rachel had pushed Michaud down a flight of stairs. On another occasion, the witness testified, Rachel had threatened to falsely tell police that the witness had raped (or attempted to rape) her.

Another witness stated that as of November or December 1997, Michaud was using drugs and was less outgoing than she had previously been; something was bothering her. Further, although he thought Michaud "would follow where ever [Daveggio] would go," the witness had described them as "equal partners" who "could stand up to each other."

A third witness testified that Christina and Rachel had admitted being in a gang, and that Rachel had once falsely accused a schoolmate of trying to pull down her skirt so that her brother would beat him up. That same witness claimed

23

to have seen Amy Doe every day during the relevant time period, but never saw bruises or cuts on Amy's face and never heard from Amy that Amy had been attacked.

Finally, a witness named Sheri explained that she had known Michaud since Michaud was 16 years old. Sheri ran a massage parlor where prostitution occurred. She testified that Michaud's father Leland would bring clients for Michaud, and that on at least one occasion, Sheri walked in on Leland and Michaud having sex with each other. Michaud, Sheri testified, also had a physically abusive boyfriend named Johnny. Sheri added that before Daveggio moved into the tri-level, Michaud "was beautiful," and her children attended a Catholic private school. After he moved in, she continued, Michaud "quit caring about herself."

### 3. Rebuttal

Daveggio called Vicki Fairbanks, a former romantic partner of his and an acquaintance of Michaud's. Among other things, Fairbanks described Michaud as "obsessed" with Daveggio and as having "manipulated" and "controlled" him.

The prosecutor called Dr. Rollins, who performed the Samson autopsy. Dr. Rollins discussed his Demerol addiction, explaining why he was "[a]bsolutely, 100 percent" sure that he was not "loaded on Demerol" when he performed the autopsy.

Rollins had "absolutely no doubt" that Samson "died from a ligature strangulation." Samson, in his opinion, "had some of the worst neck injuries I have ever seen. She had unsurviveable injuries without extensive, aggressive therapeutic intervention. She would not have lived without an airway being placed down her throat. . . . She had a reason to be dead, a clear, anatomic reason to be dead. It is just that she's in a snow bank." A rope shown to him by the

24

prosecutor, he added, was "consistent with leaving a furrow mark as [he] observed in [Samson's] neck." He also testified that if Samson had died as a result of hypothermia, he would have expected to see severe skin discoloration, which Samson did not have.

Finally, Rollins explained why he did not do a rectal exam. Although Rollins's understanding was that trauma appears in only 50 to 56 percent of cases involving forcible entry of the rectum, had he known at the time of the autopsy what he knew at the time of trial, he would have performed a rectal exam. But, he explained, "If there's no trauma there, I'm not going to . . . mutilate this person's remains."

### 4. *Closing arguments*

During his closing, Daveggio conceded that the jury could find him guilty of first degree murder. His defense focused instead on the truth of the special circumstances. He contended that defendants abducted Samson for the sole purpose of murdering her (referring to April's testimony about going "on a hunting"), and that they did not rape Samson with the curling irons.

In her closing, counsel for Michaud appeared to adopt Daveggio's arguments by reference. Unlike Daveggio, however, she did not concede that she could be held liable for the first degree murder of Vanessa Samson. She argued that her culpability was diminished by her posttraumatic stress, which rendered her particularly susceptible to domination by Daveggio. Concerning the April Doe incident, Michaud argued that she did not orally copulate April and tried to warn her to prevent the attack from happening, but was "dominated or controlled" by Daveggio. She did not seriously dispute her guilt regarding the Sharona counts, aside from alluding to the presumption of innocence.

## B. Penalty Phase

Penalty phase witnesses testified that Vanessa Samson was a beloved daughter, sister, significant other, and friend. To her mother, for example, "Vanessa was sunshine. She was always positive, always happy. Caring." To her father, she was a "fishing buddy," a "[g]reat[,] [g]reat[,] [b]ubbly" person whose grave he visited after every workday. Vanessa was buried wearing a ring her significant other had purchased for her before the last time he saw her. She used to tell her mother, "Mom, of all your children, I will be the first one to give you a grandchild."

Other witnesses called during the penalty phase testified about defendants. Several discussed additional sexual assaults that Daveggio had allegedly perpetrated against them. Rachel described an incident in which defendants plotted to kill Daveggio's ex-girlfriend.

In her defense, Michaud presented evidence that she was a battered woman under Daveggio's control, and that, among other things, she was involved with a church and had worked as a school crossing guard. Daveggio, for his part, called witnesses who spoke to his childhood, religiosity, and behavior while in prison.

Daveggio also testified.[3] In his testimony, he admitted that defendants abducted Samson, and that the "number one motive" for the abduction was sexual gratification. At some point not long after the abduction, Daveggio took the wheel. Michaud sexually assaulted Samson in the back while he drove. They eventually stopped at Sly Park, and rented a motel room in which they sexually assaulted Samson. Daveggio claimed that he wanted to let Samson live, but Michaud told him he had to kill Samson because she could identify them. After "a

---

[3] Some of Daveggio's penalty phase testimony is inconsistent with testimony adduced during the guilt phase. Our description of guilt phase incidents, and our analysis of defendants' claims of error, does not take Daveggio's penalty phase testimony into account.

26

pretty heated discussion," "[t]he way it ended was we were going to let Ms. Samson go." Daveggio went to the bathroom. By the time he emerged, Michaud had strangled Samson in the van. Defendants dumped Samson in a snow bank, returned to the motel room, and eventually proceeded to the Lakeside Inn.

Before the kidnapping, defendants had not definitively decided to kill Samson, but they agreed that they would do so if it became necessary. Daveggio denied being "fascinated with the Gallegos."

Regarding the curling irons, Daveggio said he never touched them aside from when he purchased them. It was his idea to buy them as sex toys, though Michaud modified them. Both curling irons were used to penetrate Samson.

Defendants, Daveggio testified, were basically equal partners; Michaud was "very" capable of standing up to him. "Neither one of us, I don't believe, was any control factor." Daveggio found violence and aggression sexually gratifying, but Michaud "actually[] more so."

Daveggio also described prior misconduct by Michaud. He testified that Michaud told him she had performed a contract killing for the Hell's Angels and that she had castrated and hung a "black male" she accused of raping her.

Daveggio admitted that he had considered using the bolts that anchored the (removable) back and middle van seats to tie down victims, but, after testing, did not think it would work. He confirmed that defendants assaulted Christina, Aleda, Rachel, Amy, Sharona, and April. He said the original "plan" regarding Aleda was to sell her as a sex slave, but the plan was abandoned when Aleda told them she had a child.

27

## II. DISCUSSION

### A. Denial of Severance Motions

Defendants moved for severance at various points before and during trial. It is now argued that the trial court's denial of their severance motions warrants reversal of the judgment.[4]  We find no error.

Penal Code section 1098 provides, in relevant part:  "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials."  "Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' "  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).)  "When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial."  (*Ibid.*)  We review a trial court's denial of a severance motion for abuse of discretion, based on the facts at the time of the trial court's ruling.  (*Id.* at p. 41.)  "Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial."  (*Ibid.*)

Before trial, defendants argued that their cases should have been severed because their defenses were antagonistic:  While Daveggio's planned defense to the charges was that he was not aware that Samson had not consented to the sexual acts and that he neither planned to kidnap nor murder her, Michaud's defense was

___

[4]    This argument was first raised in an amicus curiae brief filed by the California Appellate Project.  As a general rule, this court does not permit amici curiae to enlarge the issues on appeal.  In this case, however, Daveggio did not object to the new argument and Michaud expressly adopted it, so we will address it.

that Daveggio controlled her and was the instigator of their joint crimes. The contention that the nature of these defenses compelled severance relies largely on a Ninth Circuit case applying rule 14 of the Federal Rules of Criminal Procedure, *U.S. v. Tootick* (9th Cir. 1991) 952 F.2d 1078. But as this court has previously explained, the United States Supreme Court has since clarified, in *Zafiro v. United States* (1993) 506 U.S. 534, that " '[m]utually antagonistic defenses are not prejudicial *per se*.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1081; see *Zafiro*, at pp. 538–539.) Rather, antagonistic defenses require severance only when " ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) "If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates . . . guilt,' and severance is not required." (*People v. Winbush* (2017) 2 Cal.5th 402, 456, quoting *Coffman and Marlow*, at p. 41.)

Here, although Daveggio and Michaud each may have sought to cast blame on the other, it was undisputed that both had been involved in some manner in each of the incidents. The mere fact that defendants " 'may attempt to shift responsibility to each other does not compel severance of their trials[.]' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1208.) In any event, there was overwhelming independent evidence against each defendant, dispelling any notion that the conflict alone might have established guilt. With respect to the murder charge, witnesses testified that both defendants discussed "hunting" for victims; witnesses placed defendants in Lake Tahoe shortly after Samson was kidnapped; and witnesses connected defendants to the green van. Moreover, forensic evidence from the van independently linked both defendants to the victim—Michaud's fingerprints and Samson's DNA were found on the curling iron that was used to sodomize Samson and Samson's and defendants' fingerprints were on an ampm

29

Pepsi cup. With respect to the sexual offenses, Sharona Doe and April Doe testified to the sexual assaults, providing sufficient independent evidence against each defendant. The trial court did not abuse its discretion in denying defendants' pretrial severance motions.

Nor did the trial court abuse its discretion in denying Daveggio's renewed motion for severance after he pleaded guilty to the sexual offenses. The argument stresses that, despite Daveggio's guilty plea, the trial court admitted the testimony of the victims of the charged and uncharged sexual offenses. There was thus, it is argued, a "strategic conflict" between defendants: While Daveggio wanted to inform the jury of his plea early on, Michaud opposed it. The implicit assumption underlying the argument is that if Daveggio had a separate trial, the evidence of the sexual offenses could not have been used against him. The assumption is incorrect. Evidence of the sexual offenses would have been admissible even if the trial court severed his trial from Michaud's; as we discuss below, the charged and uncharged sexual acts were admissible under Evidence Code sections 1101 and 1108 for their bearing on the remaining charge against Daveggio.

We also reject the argument that Daveggio was prejudiced at the penalty phase because the "juxtaposition of [Daveggio's] mitigation next to Michaud's mitigation evidence prevented the jury from determining the appropriate sentence for [Daveggio]." As we have noted, to accept this sort of argument "would eviscerate the statutory preference for joint trials in all capital cases." (*People v. Winbush*, *supra*, 2 Cal.5th at p. 457.) There is nothing in the record that suggests that the jury compared Michaud's mitigation evidence to Daveggio's, as defendants suggest, in direct contradiction of the trial court's instruction to consider the penalty for each defendant separately. We presume that jurors follow the instructions provided by the court in the absence of a showing to the contrary. (See, e.g., *People v. Shazier* (2014) 60 Cal.4th 109, 150.)

30

Finally, we conclude that the joint trial did not deprive defendants of due process of law under the federal Constitution. " 'We have held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]' " (*People v. Soper* (2009) 45 Cal.4th 759, 783.) Defendants bear the burden of establishing that the trial was grossly unfair and denied them due process of law, and "a judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 49.) No gross unfairness has been established here. And given the strength of the independent evidence against each of the defendants, we perceive no reasonable likelihood that the jury was influenced by the joinder in its verdict of guilt.

## B.     Prior Sexual Misconduct

Defendants contend that the trial court abused its discretion by admitting evidence of the uncharged incidents involving Christina, Aleda, Rachel, and Amy Doe. They also claim that the court erroneously instructed the jury as to how to evaluate the evidence of those incidents, as well as the evidence concerning Sharona Doe and April Doe. We find no reversible error.

### 1.  Evidentiary issues

#### a. Background

The prosecution sought to introduce evidence of 15 uncharged sexual misconduct incidents involving one or both defendants. The trial court excluded evidence of 11 of those incidents under Evidence Code section 352 (section 352), on the ground that their prejudicial effect substantially outweighed their probative value, but admitted evidence of the above-described incidents concerning

31

Christina, Aleda, Rachel, and Amy Doe. The court ruled that the evidence of these incidents was admissible both under Evidence Code section 1108, which permits admission of evidence of other sex offenses in a sex crime prosecution, and under Evidence Code section 1101, subdivision (b), to show defendants' intent, motive, and common plan. The court further noted that the Aleda Doe incident was also admissible to prove defendants' identity as to the Vanessa Samson charge and appurtenant special circumstances. (See generally *People v. Balcom* (1994) 7 Cal.4th 414; *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*).)

In admitting the evidence, the trial court conducted a separate analysis under section 352. The court explained: "The court has evaluated the uncharged acts pursuant to Evidence Code section 352, the weighing of the probative value of the proffered evidence against the prejudicial effect of such evidence. Included in the criteria used by the court in this weighing process is the following: [¶] Whether the source of the evidence for the uncharged acts is independent from the source of the evidence for the charged acts; [¶] whether there is a close proximity in time from the uncharged acts and the charged acts; [¶] whether there are distinct similarities between the uncharged acts and the charged acts; [¶] whether the evidence of the uncharged acts would be cumulative; [¶] whether the evidence focused on the material facts of the case; [¶] whether the existence of other damaging information, i.e., the charged acts, minimizes the prejudicial effects; [¶] whether the uncharged acts are more inflammatory than the charged acts; [and] [¶] whether the defendants have been convicted of the uncharged acts in another proceeding."

> b. *Discussion*

Evidence must be relevant to be admissible (Evid. Code, § 350); that is, it must have some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (*id.*, § 210). A plea of "not

guilty" "place[s] all material issues in dispute" (*People v. Bivert* (2011) 52 Cal.4th 96, 117), including a defendant's intent (*People v. Scott* (2011) 52 Cal.4th 452, 471). The evidence concerning the uncharged incidents shed light on whether Daveggio and Michaud had a propensity to commit acts of sexual misconduct (cf. *People v. Reliford* (2003) 29 Cal.4th 1007, 1012 (*Reliford*); *People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*))—a propensity relevant to whether defendants kidnapped Samson solely to murder her, the rape by instrument special circumstance, and the charges of oral copulation against Michaud. The question is whether this evidence was inadmissible on other grounds.

Section 1101 of the Evidence Code limits the admissibility of so-called "propensity" or "disposition" evidence offered to prove a person's conduct on a particular occasion. (See Evid. Code, § 1101, subd. (a) (section 1101(a)).) Specifically, section 1101(a) instructs that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) clarifies that subdivision (a) does not prohibit the admission of evidence relevant "to prove some fact . . . other than [the person's] disposition to commit such an act," such as the person's "motive, opportunity, intent, preparation, plan, knowledge, [or] identity." (Evid. Code, § 1101, subd. (b) (section 1101(b)); see also *id.*, § 1101, subd. (c) [discussing witness credibility]; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406 (*Bryant*).)

Evidence Code section 1108 (section 1108) carves out an exception to section 1101. It provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a); see also

§ 1101(a) ["Except as provided in . . . Section[] . . . 1108, . . . ."].)  Section 352, in turn, sets out the general rule that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (See also *People v. Villatoro* (2012) 54 Cal.4th 1152, 1163 (*Villatoro*) [section 1108's reference to section 352 clarifies that "section 1108 does not supersede section 352 or other provisions of the Evidence Code"] (italics omitted).)  It follows that if evidence satisfies the requirements of section 1108, including that it is not inadmissible under section 352, then the admission of that evidence does not violate section 1101.  (See *People v. Merriman*, *supra*, 60 Cal.4th at p. 59, fn. 9; *People v. Avila* (2014) 59 Cal.4th 496, 517–518 (*Avila*); *People v. Jones* (2012) 54 Cal.4th 1, 50; *People v. Loy* (2011) 52 Cal.4th 46, 63 (*Loy*); *People v. Story* (2009) 45 Cal.4th 1282, 1295 (*Story*).)

To determine whether section 1108 evidence is admissible, trial courts must engage in a "careful weighing process" under section 352.  (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)  "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]" (*Ibid.*)

A trial court's rulings admitting evidence under Evidence Code sections 1101 and 1108 are reviewed for abuse of discretion. (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*); *Story*, *supra*, 45 Cal.4th at p. 1295 ["Like any ruling under section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion."].) " ' " 'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a section 352 objection should fail. [Citation.] " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' " The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " ' " ' " (*Bryant*, *supra*, 60 Cal.4th at p. 408.)

Defendants do not dispute that section 1108 applies, and for good reason: This case is "a criminal action." (§ 1108, subd. (a) (section 1108(a)).) Both defendants were "accused of a sexual offense." (*Ibid.*; see *id.*, § 1108, subd. (d)(1)(A); Pen. Code, § 289; cf. *Story*, *supra*, 45 Cal.4th at p. 1285.) And neither defendant contests that evidence of the four incidents in question was "evidence of the defendant's commission of another sexual offense or offenses." (§ 1108(a).)

Defendants do argue, however, that the trial court abused its discretion in refusing to exclude the evidence under section 352 (although much of their argument focuses specifically on the trial court's admission of evidence for the

35

limited purposes outlined in section 1101(b), rather than for purposes of section 1108(a)). In evaluating defendants' argument, we begin by noting several considerations that form the backdrop for our inquiry. We have noted that, given section 1108's purpose of facilitating the adjudication of sex crimes—which typically occur outside the presence of potential witnesses and often leave no corroborating evidence—the case for admission of propensity evidence "is especially compelling" where, as here, "the sexual assault victim was killed and cannot testify." (*Avila*, *supra*, 59 Cal.4th at p. 515; see also *Loy*, *supra*, 52 Cal.4th at p. 62.) Additionally, it is apparent that the trial court carefully considered several of the factors our cases have identified in describing the "careful weighing process under section 352." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) The trial court whittled the 15 acts of misconduct offered by the prosecution down to four. (See *ibid.* [discussing admission of "some but not all of the defendant's other sex offenses"].) Finally, each of the uncharged incidents occurred no earlier than September 1997, close in time to the charged offenses, and each involved both defendants acting together. (Cf. *ibid.* [discussing "similarity to the charged offense"].) With these considerations in mind, we address each uncharged incident of sexual misconduct.

*Aleda Doe*: We conclude the trial court acted within its discretion when it admitted evidence of the Aleda Doe incident. Among other things, that evidence tended to show that defendants had previously abducted a young woman from the side of the road for purposes of sexual assault, as the prosecution alleged defendants had done in the case of Vanessa Samson. Further, the fact that defendants had been convicted in federal court of various kidnapping-related crimes weighed heavily in favor of admission. (See *Loy*, *supra*, 52 Cal.4th at p. 61 [conviction implies enhanced certainty that offense occurred; "no new burden of defending against the charges"; no temptation for jurors "to convict . . . of the

36

charged crime to punish . . . for the earlier crimes"; and "little danger of confusing the issues"].)  Perhaps for these reasons, trial counsel for one of the defendants "acknowledege[d] that the Aleda Doe incident is sufficiently similar and sufficiently probative to the charge in Count 4 that I am not straining my credibility by arguing against that."

*Amy Doe*:  Evidence of the Amy Doe incident was also admissible.  The evidence tended to show that, roughly one month before the Samson abduction, defendants, acting together, used force to subdue and sexually assault their victim.  True, in this instance, the force was used to restrain a resisting victim who had been lured into a hotel room, rather than (as in Samson's case) pulled from the side of the road.  But the probative value of defendants' conduct remains substantial.  Further, relatively little trial time was devoted to this incident; evidence of even extremely dissimilar offenses may be admitted under section 1108 (*Loy*, *supra*, 52 Cal.4th at p. 63); and the evidence at issue here was "less inflammatory than the evidence about the" Samson murder (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 (*McCurdy*)).

*Christina Doe*:  The trial court also properly admitted the evidence concerning Christina Doe.  The evidence tended to show that defendants previously sexually assaulted someone together.  At 13 years old, Christina was meaningfully younger than the victims of the charged offenses, and certainly younger than Samson, then 22.  But the age difference is not dispositive.  We have held, for example, that a court permissibly admitted evidence that a defendant had raped a six year old in a trial concerning the rape and murder of a 14-year-old victim.  (*People v. Williams* (2016) 1 Cal.5th 1166, 1197.)  Further, the evidence concerning the Christina Doe incident, in addition to consuming a relatively small portion of the trial (and not being seriously disputed), did not involve the violence at issue in the Samson murder.  That difference limits the evidence's prejudicial

effect.  (See *Cordova*, *supra*, 62 Cal.4th at p. 133 ["Defendant stresses that the Colorado crimes contained none of the violence of the charged crime.  But this circumstance reduces any prejudicial effect."].)  Under the circumstances, there was no abuse of discretion.

*Rachel Doe*:  Finally, we conclude the trial court properly admitted the evidence concerning the Rachel Doe incident.  We acknowledge that, like the Christina Doe incident, the Rachel Doe incident differed in certain respects from the Samson incident and involved some details likely to have a particular impact on the jurors.  Rachel was only 12 years old; she was Michaud's daughter; and some of her testimony paints Michaud in a distinctly cruel light.[5]

There is, however, no doubt that this testimony was probative of defendants' character, and was particularly relevant to the question whether Samson's abduction was for purposes of murder only, as defendants had argued.  (Cf. *McCurdy*, *supra*, 59 Cal.4th at p. 1098 [applying section 1101(b), and reasoning that "it would not be speculative to infer that, because he had committed lewd acts against his sister when she was a child, he abducted Piceno with the intent to commit a lewd act against her"].)  The probative value of the evidence is particularly strong as concerns Michaud.  Rachel testified that Michaud had played a central role in instigating the abuse.  Rachel testified that Michaud referred to her as her "secret lust," and that when Michaud stopped masturbating, she told Daveggio, "Okay, James, you can stop now," and he did.  This testimony supports

---

[5]     There was at least some suggestion, though fleeting, that Rachel had previously threatened to fabricate a claim of rape (or attempted rape)—which may be thought to bear on the "certainty of [the offense's] commission."  (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)  But aside from general attacks on Rachel's credibility, defendants had little defense to these allegations—and Christina's observation that Rachel looked frightened, and had "red marks and like black lines" around her cheeks, mouth, and wrists, tends to confirm that the incident occurred.

38

an inference that Michaud was not merely Daveggio's passive, unintentional victim. Although Rachel's testimony was undoubtedly damaging, we cannot say that the trial court abused its discretion when it concluded that the danger of undue prejudice did not substantially outweigh the probative value of the testimony.

Finally, defendants contend that the admission of the four uncharged sex offenses under section 1108 violated the federal Constitution's due process guarantee. We have previously rejected this argument (see *Falsetta*, *supra*, 21 Cal.4th at p. 907), and defendants offer no persuasive reason to reconsider that holding.

### 2. *Instructional issues*

#### a. *Section 1101(b) instruction concerning section 1108(a) evidence*

In addition to admitting the prior sex offense evidence under section 1108, the trial court also admitted it under section 1101(b). The court instructed the jury that it could consider the prior acts as evidence of defendants' motive; intent; common method, plan, or scheme; and the existence of any good-faith belief in the victims' consent. (See § 1101(b).) The court also informed the jury that the Aleda Doe incident could be used as proof of identity as to the Samson charge and special circumstance allegations.

Defendants argue the trial court erred in admitting the prior sex offense evidence under section 1101(b), and thus erred in instructing the jury that it could consider the evidence for the limited purposes described in section 1101(b). The first objection is without merit; as noted above, the evidence was properly admitted under section 1108(a), which defeats any objection that the evidence was inadmissible under Evidence Code section 1101. (See § 1108(a) [evidence admissible under section 1108(a) "is not made inadmissible by Section 1101"].)

The second objection, concerning the trial court's instructions that the evidence could be considered for the purposes identified in section 1101(b), is likewise without merit. At a minimum, the evidence was admissible to shed light on defendants' motive and intent. We have explained that "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) Evidence is admissible for these purposes if there is "sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive." (*McCurdy*, *supra*, 59 Cal.4th at p. 1097.) Here, defendants lured or kidnapped each of their victims to a designated location, where they sexually assaulted them by threat or use of force. Despite the substantial age difference between some of the victims, the similarity between the uncharged and charged offenses provided a sufficient basis for the jury to conclude that defendants acted with the same criminal intent or motive, rather than by " 'accident or inadvertence or self-defense or good faith or other innocent mental state.' " (*Ewoldt*, *supra*, at p. 402.)

The evidence of the uncharged acts against Aleda Doe was also admissible under section 1101(b) to prove identity with regard to the Samson incident. This court has established that "[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity . . . . [T]he uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) This high level of similarity is present here—both Aleda Doe and Samson were kidnapped by defendants from the side of the road and were placed in a van, where defendants sexually assaulted them.

The degree of similarity required to prove the existence of a common design or plan falls between these two poles.  (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."  (*Id.* at p. 403.) Given that the evidence of the prior sex offenses was properly admitted under Evidence Code section 1108, we need not decide whether this evidence was also admissible to show an overarching common plan or scheme across the various charged and uncharged incidents, because any assumed error on this score would be harmless.  (See *Falsetta*, *supra*, 21 Cal.4th at p. 920 ["evidence of a defendant's other sex offenses constitutes relevant circumstantial evidence that he committed the charged sex offenses"].)  The trial court committed no reversible error in instructing the jury that it could consider evidence of the prior incidents for that purpose.

Finally, defendants argue that the trial court's instruction permitted the jury to consider the uncharged sex offenses as evidence of their propensity to engage in sex offenses, in violation of the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution.  But as explained above, we have already held that the federal Constitution permits reliance on proof of uncharged sex offenses as relevant to a defendant's propensity to engage in crimes of the same type, subject to the careful weighing analysis prescribed by section 352.  Defendants fail to establish that the trial court committed reversible federal constitutional error by instructing the jury under section 1101(b) as well as section 1108(a).

> b.     *Evidence of charged offenses as propensity evidence*

Defendants also contend that the trial court's instructions erroneously permitted the jury "to draw an inference of criminal propensity from evidence

41

pertaining to *charged* offenses"—specifically, the offenses involving Sharona Doe and April Doe—"that had not been subjected to the trial court's exercise of discretion under Evidence Code section 352 as required by Evidence Code section 1108." As we explained in a decision issued while this appeal was pending, evidence of charged sex offenses, like evidence of uncharged sex offenses, may give rise to an inference of propensity to commit similar crimes, but the trial court's decision to permit the jury to consider the evidence for that purpose is properly guided by a section 352 weighing analysis. (See *Villatoro*, *supra*, 54 Cal.4th at pp. 1161–1164.)

Here, although defendants argue otherwise, we conclude the trial court did exercise its discretion under section 352. In the trial court, Daveggio moved to bifurcate, urging that the counts to which he had pleaded guilty (counts 1–3) should be tried separately from the murder (count 4). Michaud appears to have joined the motion, pursuant to the trial court's ruling that "cocounsel will join in motions unless otherwise stated." Although Daveggio acknowledged that evidence of the Aleda Doe incident might be admissible in a trial concerning only count 4, he urged that "everything else is textbook 352."

The trial court denied the motion to bifurcate. In so doing, it expressly rejected defendants' section 352 argument. In the same statement of decision that described the court's "exercise[] [of] discretion pursuant to Evidence Code [section] 352" regarding the uncharged acts, the court explained that "[i]f the events charged in counts one, two, and three were uncharged acts, they would be admissible in the trial concerning count four under the analysis used by the court regarding the [uncharged] events . . . . The facts relating to the events involving Sharona Doe and April Doe are similar to the facts involving the other uncharged Does and would thus be admissible under Evidence Code [section] 1101(b) on the issue of intent, motive and common plan and design or under Evidence Code

42

section 1108. [¶] Therefore, as between counts one, two, three, and count four, there would be cross-admissibility of evidence, which would be the determining factor on the bifurcation issue. [¶] In addition, the court finds [that] while all of the counts charged are to a certain extent inflammatory, none of the counts is noticeably more inflammatory than the others. . . ." This discussion makes clear that the trial court exercised its discretion under section 352 when resolving defendants' motion to bifurcate.

Michaud asserts in her reply brief that the trial court's ruling on the motion to bifurcate cannot be regarded as an exercise of section 352 discretion because the ruling was made before trial, while section 352 review "typically occurs during trial in the context of evidence already before the jury . . . ." We see no persuasive reason to disregard the trial court's section 352 analysis simply because it was conducted before trial. And Michaud points to no change occurring at trial that she contends could or would have altered the trial court's section 352 analysis.[6] Further, since defendants do not argue that the trial court abused its discretion under section 352, we do not reach that issue here.

---

[6] A section heading in Daveggio's opening brief asserts, without further elaboration, that the court's instruction "allowed the jury to find he had a propensity for committing sex offenses from which it could be inferred . . . that he committed malice murder." We agree with the Attorney General that this "point is not properly raised: it is perfunctorily asserted without argument in support." (*People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15, abrogation on other grounds recognized by *People v. Russell* (2010) 50 Cal.4th 1228, 1271.) Indeed, it is not clear precisely what the heading is meant to convey. If Daveggio means that "the jury would view the instructions as permitting it to find defendant guilty of [a] murder based *solely* on his prior sexual offenses," we have previously rejected that argument in the face of similar instructions. (*Loy*, *supra*, 52 Cal.4th at p. 76, italics added, discussing *Reliford*, *supra*, 29 Cal.4th at p. 1013.)

### C. Other Claims of Evidentiary Error

Defendants claim the trial court made several other erroneous rulings concerning fingerprint evidence, carpeting in Michaud's van, and certain weaponry. We consider each claim in turn.

#### 1. Fingerprints

Defendants argue that the trial court violated state law and the federal Constitution by refusing to hold a hearing on the admissibility of certain fingerprint evidence and refusing to exclude testimony that collected fingerprints "matched" defendants' exemplar prints. We conclude the trial court did not prejudicially err by declining defendants' requests.

#### a. Background

Before trial, defendants "object[ed] to any expert introduced here making a conclusionary [*sic*] statement on the fingerprints in that there's no scientific evidence to support such a conclusion." In support of their argument, defendants presented the trial court with a newspaper article discussing the decision of a federal district court that had reportedly concluded that fingerprint identification by certain experts did not pass the *Kelly/Frye* standard for general acceptance of scientific evidence. (See *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014.) "[A]s I recall the article," counsel explained, "the court there did allow experts to testify to points of similarity, but did not allow them to draw conclusion[s] as to identity. It's my—I don't have a copy of that decision and it is my understanding that this is an area that's under controversy here in the local federal districts." The trial court overruled the objection.

Defendants then requested "at a minimum *Daubert* or *Kelly*/*Frye* hearings." (See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579

44

(*Daubert*).)  The court overruled that objection as well.  The court did, however, authorize some voir dire and cross-examination concerning the issue, in particular concerning defendants' request to "be able to inquire if [witnesses] participated in that study that the FBI conducted where various sample exemplar prints were sent to various experts and there was no unanimity on agreement."  The jury ultimately heard testimony identifying certain latent fingerprints on objects found in the van as belonging to Michaud, Daveggio, and Samson.

### b. Discussion

Under the *Kelly*/*Frye* (or simply "*Kelly*") inquiry applicable in California courts, "when faced with a novel method of [scientific] proof, [we] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial. (*Kelly*, *supra*, 17 Cal.3d at p. 30; see also *People v. Venegas* (1998) 18 Cal.4th 47, 78 (*Venegas*) [admission also requires proof of expert qualifications to testify as to general acceptance and demonstration that correct scientific procedures were used in the particular case].)[7]  The *Kelly* "approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not." (*People v. Webb* (1993) 6 Cal.4th 494, 524; see *People v. Stoll* (1989) 49 Cal.3d 1136, 1155–1156.)

The logic of *Kelly* suggests that advances in scientific understanding may strip a scientific technique of the general acceptance it once had.  (See *Kelly*,

---

[7]  This test originated with *Frye*, an influential federal appellate decision.  In federal courts, *Frye* has been superseded by the standard articulated in *Daubert*. (See *Daubert*, *supra*, 509 U.S. at pp. 589–598.)  Under *Daubert*, while "[w]idespread acceptance can be an important factor in ruling particular evidence admissible," general acceptance is not "an absolute prerequisite to admissibility." (*Id.* at pp. 594, 588.)  Notwithstanding *Daubert*, *Kelly*/*Frye* remains the law of California. (*People v. Leahy* (1994) 8 Cal.4th 587, 591; see also *id.* at pp. 593–604.)

*supra*, 17 Cal.3d at p. 32 ["[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, *at least until new evidence is presented reflecting a change in the attitude of the scientific community*" (italics added)]; see also *People v. Jones* (2013) 57 Cal.4th 899, 937; *People v. Doolin* (2009) 45 Cal.4th 390, 447; *People v. Bolden* (2002) 29 Cal.4th 515, 546; *Venegas*, *supra*, 18 Cal.4th at pp. 53, 78.) Just as jurors may be unduly persuaded by the " 'misleading aura of certainty which often envelops a new scientific process,' " (*Kelly*, *supra*, 17 Cal.3d at p. 32, quoting *Huntingdon v. Crowley* (1966) 64 Cal.2d 647, 656), so too might they be unduly persuaded by familiar methods of proof that have fallen into disrepute in the relevant scientific community. Indeed, familiar methods of proof may pose a risk of deception precisely because they are familiar.

Defendants contend that fingerprint comparison evidence falls into this category. New scientific understandings, they argue, show that fingerprint evidence may not be as reliable an indicator of identity as it has generally been understood to be. In light of those understandings, they argue they were entitled to a *Kelly* hearing. We disagree.

"[F]ingerprint comparison has a long history of acceptance" as a form of identification evidence. (*In re O.D.* (2013) 221 Cal.App.4th 1001, 1008, citing cases.) In *People v. Farnam* (2002) 28 Cal.4th 107, 160, this court rejected a *Kelly* challenge to the admission of testimony concerning the use of a computerized system for comparing latent prints to fingerprints in a database. We explained that although the police had used the system "to narrow the range of potential candidates whose fingerprints might match the latent prints, the prosecution relied on a long-established technique—fingerprint comparison

46

performed by fingerprint experts—to show the jury that defendant's fingerprints matched those found" at the scene.  (*Ibid.*)

The Court of Appeal in *In re O.D.* similarly rejected a *Kelly* challenge to the admission of fingerprint comparison testimony, reasoning that "fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty." (*In re O.D.*, *supra*, 221 Cal.App.4th at p. 1007; see also *People v. Rivas* (2015) 238 Cal.App.4th 967, 975–976 [agreeing with *In re O.D.* that fingerprint comparison testimony is not subject to challenge under *Kelly*].)

Defendants have made no showing that would warrant reevaulation of the admissibility of fingerprint comparison evidence.  As defendants acknowledge in their briefs, they relied primarily on a newspaper article reporting on the ruling of a single federal district court.  This is manifestly insufficient to warrant reconsideration of a form of evidence that has for many years been universally accepted. (Cf. *U.S. v. Baines* (10th Cir. 2009) 573 F.3d 979, 988 [upholding the admission of fingerprint evidence under the *Daubert* standard and noting, inter alia:  "Every published decision to address this issue has found the evidence admissible.  Fingerprint evidence has been admissible in this country for almost 100 years."].)

Although it is unnecessary to our conclusion, we further note that any conceivable error in admitting the fingerprint evidence was harmless beyond a reasonable doubt.  As one of the defendants correctly pointed out during closing argument, the significance of the fingerprint evidence (particularly a cup in the van bearing Samson's print) was that it indicated that defendants abducted Samson.  But the proof that defendants abducted Samson was overwhelming even without that evidence; for example, Samson's DNA was also found inside the van,

and witnesses to Samson's abduction testified to observing a van matching the description of Michaud's van driving away from the scene.

### 2. Carpet

Defendants claim the trial court abused its discretion by admitting evidence that "cuts had been made in the carpeting in [Michaud]'s van that allowed access to unused seat anchor bolts to which ropes could be secured to theoretically restrain someone in a spread-eagled position." Defendants' claim lacks merit.

#### a. Background

The van had removable back and middle seats. When the seats were removed, the bolts that anchored the seats to the van's floor were exposed. The evidence in question indicated that a carpet had been placed over the floor and cut in a manner that permitted rope to be passed through four of the bolts, but did not permit the seats to be secured to the van. That evidence included photographs of the carpet, a template revealing the pattern of the slits, and photographs of rope passing through the slits on the template. Although there was evidence that defendants had rope with them in the van, no rope marks indicated that Samson's limbs had been restrained.

Defendants objected that there was no evidence Samson was ever tied down to the bolts, and argued the evidence was unduly inflammatory and suggestive. The trial court disagreed, expressing doubt that there was any legitimate purpose for the slits in the carpet and deeming the evidence "more probative than prejudicial on the issues of planning, premeditation, and scheming."

#### b. Discussion

Defendants claim the trial court abused its discretion when it admitted the carpet-related evidence. The probative value of that evidence, defendants argue,

was either nonexistent (Evid. Code, §§ 210, 350), or at least outweighed by the "substantial danger of undue prejudice" that it posed (§ 352).

At the threshold, it is at least debatable whether defendants have preserved an objection to anything other than the photographs of ropes passing through the template, such as photographs of the template and carpet themselves. Before trial, following defendants' initial objections and some discussion between the parties, the court said, "But nobody has any objection to the fact that if there is a template showing those four holes placed in the back of the van that correspond with those eyebolts, you are not objecting to that concept, *you are just objecting to the fact they have ropes coming through there*." Counsel for Michaud responded, "Basically, yes." Counsel for Daveggio added, "Yeah. The template is supposed to be, I assume for ease rather than moving the rug back and forth. There is no objection to this diagram." This colloquy could be read to suggest a waiver of any earlier objections concerning the carpet and the template itself, especially because, when the prosecutor sought admission of the carpet-related exhibits, defendants objected only to "photographs that show ropes protruding from the holes in either the carpet or the exemplar."

We need not decide the extent to which defendants preserved their objections to admission of the other carpet-related evidence, however, because the objections lack merit in any event. As the trial court noted, the slits in the carpet had no obvious legitimate purpose. The template (with ropes passed through) made clear that the slits aligned with the anchor bolts on the van, giving rise to an inference that defendants intended to use those bolts for purposes of restraint. That inference was plainly relevant to the disputed issue of whether defendants

49

planned to sexually assault Samson, or instead abducted her solely to kill her. (See Evid. Code, § 210.)[8]

It is true that no rope markings indicated that Samson's limbs were tied, and no physical evidence confirmed that rope had ever been passed through the slits in the carpet. But the suggestion that defendants planned to use the anchor bolts to restrain Samson remained an entirely reasonable and probative inference. Further, in light of the other evidence presented, such as the ball gag and curling iron, the idea that defendants planned to use (or perhaps even actually used) ropes to restrain Samson was not especially inflammatory. Accordingly, we cannot conclude that the trial court abused its discretion rejecting defendants' argument that this evidence posed a danger of undue prejudice that substantially outweighed its probative value. (§ 352.)[9]

### 3. Weapons

Defendants challenge the admission of evidence concerning guns, ammunition, crossbows, and crossbow bolts. That evidence, defendants contend, was irrelevant (Evid. Code, § 350), unduly prejudicial (§ 352), and violated the rule against admission of propensity evidence (§ 1101(a)). We reject each of these arguments.

### a. Background

Before trial, the parties discussed whether the prosecution could use as an exhibit a poster board containing photographs of "evidence of all the weapons that were recovered." In arguing that the exhibit was proper, the prosecutor noted the

---

[8]     Some of defendants' briefing can perhaps be read as cursorily asserting that the evidence was propensity evidence inadmissible under section 1101(a). Suffice it to say that evidence may be admitted to prove intent without running afoul of that section. (§ 1101(b).)
[9]     Defendants' cursory assertions that the admission of the evidence violated their constitutional rights likewise lack merit.

50

existence of questions concerning whether the oral copulation and sexual penetration of Sharona Doe had been accomplished by force or fear; urged that she was "entitled to show they used force and fear in accomplishing the acts they did to Vanessa Samson," an issue relevant to felony murder and the rape-by-instrument special circumstance; and discussed testimony regarding guns, ammunition, and "[t]he crossbow and the [bolts] for the crossbow [that] were recovered inside the van." The prosecutor continued, "[T]he other relevance of the crossbow is that Mr. Daveggio talked to Christina Doe and Rachel Doe about how it is easier to kill someone with a crossbow because it is silent as opposed to how loud his .38 was, and talked about the methods of killing and the fact that a crossbow could be used in a silent method; more proof that he studied methods of killing."

Defendants objected, noting that the evidence in the case made clear that Samson had not been killed by a crossbow. The court replied, "It is a deadly weapon. If the allegation is force and fear and it is found at the scene of the alleged crime, I think it is certainly relevant, isn't it? I think so. . . . I mean, they found [the crossbow] in the van; is that right?" The prosecutor replied, "That is right." The court concluded, "Force and fear is an allegation. It is a deadly weapon and found at the scene and location of the alleged crime. I think that is certainly as relevant as you need to get."

After the last witness testified, but before closing argument, the prosecution sought the admission of the same poster board. Defense counsel objected, arguing that the evidence was irrelevant and that it should be excluded under section 352. The court admitted the exhibit, also overruling an objection complaining of speculation.

Later, the prosecution sought admission of evidence concerning ammunition. Defense counsel objected on grounds of foundation, relevance, and

section 352, describing the evidence as "ammunition . . . found in the van." The prosecutor responded: "There was testimony that a .25 auto was used in several of the crimes and the .38 was shot off as a threat to Christina and Rachel to keep quiet. And these are .25's and .38's. And the .25 auto was recovered in the hotel room." Counsel for Daveggio objected that "[t]here is no showing a firearm was used with the homicide case that remains against Mr. Daveggio." The court admitted the evidence.

### b. Discussion

Defendants contend that the trial court abused its discretion by admitting evidence concerning the crossbow found in the van. The contention lacks merit. The crossbow was relevant to whether the sexual penetration of Samson was accomplished by force or fear, and it shed light on how defendants were able to control her during the incident. That was particularly probative given defendants' assertion that lack of visible external trauma indicated that Samson was not penetrated at all. Testimony indicated, for example, that the curling iron had "a good likelihood" of causing trauma "unless some care was taken," and evidence whether defendants were controlling Samson, or whether she was resisting, was relevant to shed light on the nature of the attack. The probative value of this evidence was not outweighed by a risk of undue prejudice. Given the misconduct of which defendants were accused, having a crossbow (or bolts for that crossbow) was hardly inflammatory. True, as defendants emphasize, the victim was not killed with a crossbow. But just because evidence may not be admissible as proof of the murder weapon does not mean it is not admissible at all. (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1248–1249; cf. *People v. Riser* (1956) 47 Cal.2d 566, 577 ["It was error therefore to admit the Colt, two of the holsters, the belts, and the box of .22 shells. *The P38 was admissible on other grounds that appear below*." (Italics added.)].) Further, while defendants do not appear to have

preserved an objection that the crossbow was merely evidence of the act of crossbow possession, admitted to show propensity (§ 1101(a)), that objection lacks merit in any event; the "fact" of crossbow possession was relevant to prove something beyond defendants' "disposition to commit" misconduct (§ 1101(b)).

Defendants further object to evidence that "guns were seized from Michaud's van and from the motel room occupied by [defendants] at the time of their arrest." We assume arguendo that this objection is preserved, notwithstanding the fact that defendants' objections focused on the crossbow and the ammunition. Like the crossbow, this evidence was relevant to issues regarding whether defendants accomplished the charged crimes by force or fear, and it was not, in context, unduly prejudicial. Additionally, while the ammunition found with or near defendants at the time of their arrest is less probative than the guns themselves, the fact that the guns were loaded (or that ammunition was available for loading) is relevant and not unduly prejudicial.

The gun evidence was also, more specifically, relevant to the incident involving Sharona Doe. Among other things, Sharona testified that: At some point during her abduction, both defendants threatened to kill her; she had previously seen both defendants with a gun; and, when defendants were dropping her off at the end of the assault, Daveggio retrieved a gun from a pocket behind the passenger seat and flashed it "in [a] way that made me know that if I told that he was going to kill me." Defendants argue that the gun evidence was not relevant to whether the oral copulation of Sharona Doe was accomplished by force or fear, since the oral copulation was complete when Daveggio flashed the gun. But even accepting this argument, the incident involving the gun was, in any event, relevant to explain why Sharona initially lied to police about the incident.

Defendants also argue that the court should not have admitted certain evidence recovered from the Carpenters' home. In particular, they complain that a

53

crossbow found among items that defendants left there had little probative value, since no crossbow was involved in the Sharona incident and defendants had dropped off their belongings, including the crossbow, before the Samson incident occurred. Nevertheless, defendants have not apprised us of any objection informing the trial court that this crossbow should have been treated differently because it was not found in the van, and we are not aware of any such objection. Likewise, while some of the ammunition to which defendants objected appears to have been recovered from the Carpenters' home, the objection defendants identify in their briefing on appeal described the evidence at issue as "ammunition . . . *found in the van*." Accordingly, we doubt these claims of error are preserved. (See *People* v. *Partida* (2005) 37 Cal.4th 428, 435.) In any event, the admission of this evidence, if erroneous, was plainly harmless. Other, far more shocking evidence was properly admitted—and this evidence was not even distinctive, since other crossbow- and ammunition-related evidence was in evidence.

### D. Other Claims of Instructional Error

In addition to their claims of instructional error concerning evidence of prior sexual misconduct, defendants challenge the trial court's instructions concerning (1) the prosecution's burden of proof beyond a reasonable doubt; (2) the "equal guilt[]" of a direct perpetrator and an aider and abettor; (3) the independent felonious purpose required to sustain the kidnapping special circumstance allegation; and (4) defendants' decision not to testify. We address each challenge in turn.

#### 1. Reasonable Doubt

Defendants argue that the trial court committed reversible error when it instructed prospective jurors about the meaning of "reasonable doubt." The claim lacks merit.

54

### a. Background

In August 2001, the trial court addressed several groups of prospective jurors who had yet to complete juror questionnaires. In each session at issue here, the court discussed the presumption of innocence and requirement of proof beyond a reasonable doubt. One fairly representative example of the court's description of those concepts went as follows:

"The most important concept we deal with in the criminal system is the presumption of innocence. The fact that the defendants have been charged with the crime I just read to you, the fact that this trial is taking place, is no evidence whatsoever of the truth of those charges or any evidence of their guilt. [¶] . . . [¶]

"The defendants sit here cloaked in innocence. Because they entered a plea of not guilty, it is up to the prosecution to prove the defendants' guilt. They must prove each and every element of each and every charge that they have filed against the defendants, and they must prove it to beyond a reasonable doubt, which I will discuss with you in a moment. [¶] . . . [¶]

"The burden of proof that the prosecution has to meet is what we call beyond a reasonable doubt. And it is the highest burden of proof provided for in the law. It does not mean beyond all possible or imaginary doubt, because every time you talk about human affairs and human interaction you can always conjure up some imaginary doubt.

"Basically, it is an evaluation of the facts and the evidence, based upon common sense and reason, to see if you are left with any reasonable doubt after you hear the testimony and see the other evidence.

"You have all seen the Lady of Justice who has the scales, maybe not all of you, but some of you have. In a criminal case, the scales of justice start tipped in favor of the defense, because the defendants are presumed to be innocent. The burden the prosecution must meet is to bring those scales into balance and then

55

substantially tip them in favor of the truth of the charges that were filed against the defendants.

"There is no number we assign to this and no percentage. But you can see that it is a fairly substantial burden that the prosecution must meet to prove their case."[10]

Trial began nearly six months later. After the trial began, the jury received two other sets of instructions regarding reasonable doubt. First, in February 2002, before Aleda Doe testified, the court preinstructed the jury on matters that might pertain to her testimony. Among other things, the court explained that if the jury found "beyond a reasonable doubt that a defendant committed prior sexual offenses, that is not sufficient by itself to prove beyond a reasonable doubt that he or she committed the charged crimes. The weight and significance of the evidence, if any, are for you to decide." The court then read CALJIC No. 2.90, which explains the concepts of reasonable doubt and the presumption of innocence.[11]

---

[10]    The court's pretrial commentary varied to some extent across its sessions with prospective jurors. Defendants, however, have not identified what comments were made to the jurors who were ultimately impaneled, and it is not clear from the record which prospective jurors attended which session. For the sake of the discussion that follows, we will assume that each of the impaneled jurors heard a set of comments substantially similar to the example set out above.

[11]    In accord with CALJIC No. 2.90, the jury was instructed: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to a verdict of not guilty. This presumption places upon the people the burden of proving him or her guilty beyond a reasonable doubt.
[¶] Reasonable doubt is defined as follows: [¶] It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

Second, after closing arguments were concluded in May 2002, the trial court again instructed the jury on reasonable doubt in accordance with CALJIC No. 2.90—once with the accompanying discussion of the presumption of innocence, and once without. The court also provided a written copy of the full instruction to the jury.

### b. Discussion

The federal Constitution's due process guarantee "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364.) The Constitution "does not require that any particular form of words be used in advising the jury of the government's burden of proof," but it does require that, " 'taken as a whole, the instructions . . . correctly conve[y] the concept of reasonable doubt to the jury.' " (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 (*Victor*).) What matters, for federal constitutional purposes, is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on" insufficient proof. (*Id.* at p. 6.)

Defendants do not object to the giving of CALJIC No. 2.90, an instruction we have repeatedly upheld against constitutional challenge. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 42 & fn. 15; see also *People v. Brown* (2004) 33 Cal.4th 382, 391–392 & fn. 2; *Victor*, *supra*, 511 U.S. at pp. 7–17; *People v. Freeman* (1994) 8 Cal.4th 450, 504 & fn. 9 (*Freeman*); *People v. Hearon* (1999) 72 Cal.App.4th 1285, 1286–1287 [collecting cases].) Defendants argue, however, that the trial court's comments about reasonable doubt during jury selection improperly diluted the reasonable-doubt standard in four respects. Defendants acknowledge that they did not object to the trial court's statements at the time they were made, but they contend that no objection was required because the asserted errors affected their substantial rights. (Pen. Code, § 1259.) The

Attorney General concedes that evaluating the merits of that argument requires us to consider the merits of defendants' asserted claims of error. We thus proceed to consider the merits of defendants' claims.

First, defendants complain that the trial court failed to explain that jurors must have an "abiding conviction" of the defendants' guilt to convict. Defendants do not contend that the omission of the "abiding conviction" standard rendered the comments misleading, but instead contend that the trial court should have elaborated further on the "nature and depth of certitude necessary for conviction." But while the court omitted mention of the phrase "abiding conviction" during its discussion with prospective jurors, the court later advised the selected jurors— multiple times—that they could not convict absent "an abiding conviction of the truth of the charge." The trial court's earlier omission of that language posed no risk of diluting the prosecution's burden of proof.

Second, defendants argue that the court should not have advised prospective jurors that, if selected, they could rely "upon common sense and reason" in reaching a verdict. This statement diluted the prosecution's burden of proof, defendants claim, because it permitted each potential juror to "apply his or her own common sense *in addition to* reason in evaluating the evidence." The argument is unpersuasive. Common sense may provide the premise upon which reason operates; indeed, it is hard to see how jurors could perform tasks such as evaluating witness credibility without keeping common sense in mind. (Cf. *People v. Centeno* (2014) 60 Cal.4th 659, 669 (*Centeno*) ["jurors may rely on common knowledge and experience in *evaluating* the evidence"]; *Venegas*, *supra*, 18 Cal.4th at p. 80 [jurors may often "rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them"].) It is not reasonably likely that prospective jurors believed that, if selected, they could rely on common sense that exceeded the bounds of reason in reaching a verdict.

58

Defendants rely on *People v. W.E. Paulsell* (1896) 115 Cal. 6 for the proposition that a trial court errs by invoking "common sense" in connection with a reasonable doubt instruction. *Paulsell* did reverse a conviction following a reasonable-doubt instruction invoking "reason and common sense," but as later cases made plain, the ground for reversal was not the trial court's invocation of the term "common sense," but the court's refusal to adhere to previously approved language describing the reasonable-doubt standard. (*People v. Manasse* (1908) 153 Cal. 10; *People v. White* (1897) 116 Cal. 17, 19.) Defendants cite no case in which a court has concluded that it is reversible error to mention reliance on "common sense and reason" in reaching a verdict, and we are aware of none.[12]

Third, defendants contend that the trial court's references to concepts like "human affairs and human interaction" and "how people interact and what people do in everyday life" lowered the burden of proof. Defendants are right to say that jurors should not be instructed to convict based on the level of certainty needed to make decisions "in the ordinary affairs of life." (*People v. Brannon* (1873) 47 Cal. 96, 97.) But that is not what the trial court told the prospective jurors. It instead told them that "beyond a reasonable doubt" does not mean "beyond all possible or imaginary doubt," because—in "human affairs," "human interaction," and "everyday life"—some doubt can always be conjured. In so advising the prospective jurors, the trial court essentially paraphrased CALJIC No. 2.90, which explains that a reasonable doubt "is not a mere possible doubt[,] because

---

[12] On the contrary, federal courts have frequently included "common sense" in their definitions of reasonable doubt. (See *Freeman*, *supra*, 8 Cal.4th at p. 527, fn. 1 (conc. opn. of George, C. J.) [discussing federal pattern instruction]; 1A O'Malley et al., Federal Jury Practice and Instructions (6th ed. 2008) § 12:10, pp. 160–161; see also, e.g., *U.S. v. Munson* (1st Cir. 1987) 819 F.2d 337, 346 ["[I]n trying to define the difficult concept of 'reasonable doubt,' the court told the jury to exercise its common sense in assessing whether a doubt is reasonable. The court was merely telling the jury to do the obvious."].)

everything relating to human affairs is open to some possible or imaginary doubt." (Accord, Pen. Code, § 1096.) We discern no error in the statement. (See *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 42 & fn. 15.)

Fourth, and finally, defendants claim that the trial court should not have analogized to the scales of justice in explaining the meaning of "reasonable doubt." As they put it, "[T]he combination of the use of the imagery of movement of the scales of the Lady of Justice and the trial court's definition of the reasonable doubt standard as 'tipped' and 'substantially tipped' conveyed the impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt."

In considering this argument, we must keep in mind that the challenged comments were made before the jury had even been selected and several months before the trial began. Once the trial was underway, the jury was repeatedly instructed on the meaning of reasonable doubt in accordance with CALJIC No. 2.90. We consider it unlikely that the trial court's description of the reasonable doubt standard was the sort that "create[s] such an indelible impression on prospective jurors that they are unable to follow specific instructions given at the time the case is submitted to the jurors for decision." (*People v. Holt* (1997) 15 Cal.4th 619, 662; accord, *People v. Myles* (2012) 53 Cal.4th 1181, 1219; cf. *People v. Avila* (2009) 46 Cal.4th 680, 716 [trial instructions made jury "fully aware" of "what evidence could be considered mitigating," notwithstanding voir dire comments].) Indeed, even instructions *during* trial that misdescribe the burden of proof may, in light of other instructions, leave no reasonable likelihood that the jury misunderstood the proof required. (See *People v. Espinoza* (1992) 3 Cal.4th 806, 823 [court's brief misstatement suggesting "that a verdict of *not* guilty had to be proven beyond a reasonable doubt" was immaterial in light of other instructions, including CALJIC No. 2.90].)

The instructions at issue in this case differ from those at issue in *People v. Garcia* (1975) 54 Cal.App.3d 61, on which defendants rely. In that case, the Court of Appeal held that a trial court erred when it provided a then-standard reasonable-doubt instruction but added: " 'In other words, reasonable doubt means just what the term implies, doubt based upon reason, doubt that presents itself in the minds of reasonable people who are weighing the evidence in the scales, one side against the other, in a logical manner in an effort to determine wherein lies the truth.' " (*Garcia*, *supra*, at p. 68, fn. omitted.) The Court of Appeal reasoned that the instruction impermissibly watered down the prosecutor's burden of proof. It explained that the instruction was "strikingly comparable" to the civil preponderance-of-the-evidence standard, adding, "[t]his 'weighing' process, where a tipping of the scales determines the 'truth,' is wholly foreign to the concept of proof beyond a reasonable doubt." (*Id*. at p. 69.) Other courts have also criticized use of a scales-of-justice analogy. (Cf. *State v. Smith* (1981) 183 Conn. 17, 28 [438 A.2d 1165, 1170] ["Under the charge, the jury could have found the defendant guilty if they believed beyond a reasonable doubt that the 'scale' had been *tipped* in favor of conviction. This is not the same as the constitutionally mandated standard of proof beyond a reasonable doubt."]; *Commonwealth v. New* (1946) 354 Pa. 188, 215 [47 A.2d 450, 465] ["[T]he Commonwealth cannot obtain a conviction on evidence which 'just tips the scales' . . . ."].)

In this case, although the trial court invoked a scales-of-justice analogy, it also stressed that the prosecutor's burden of proof was "the highest burden [or "standard" or "level"] of proof provided for in the law." It further noted that, in a criminal case, the scales of justice begin weighted in favor of the defendant (due to the presumption of innocence), and must not only be returned to equipoise, but "substantially tipped" in favor of the prosecution, to sustain a conviction. The

court's use of the scales-of-justice metaphor thus did not evoke a simple preponderance inquiry.  (Cf. *State v. Moss* (1983) 189 Conn. 364, 369–370 [456 A.2d 274, 276] ["The use of a balance scale analogy, while undesirable, is not inherently misleading.  [¶] . . . [¶]  The charge makes it clear that the level of proof must shift substantially out of equipoise in order to support a finding of guilt beyond a reasonable doubt."].)  To be clear, we do not encourage the use of the metaphor.  But the court's comments are far afield from the instruction at issue in *Garcia*.

Nor is this case like *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, on which defendants also rely.  The prosecutor there showed jurors six pieces of an eight-piece puzzle representing the Statue of Liberty, urging the jurors that they " 'know [what] this picture is beyond a reasonable doubt without looking at all the pieces of that picture.  We know that that's a picture of the Statue of Liberty, we don't need all the pieces of . . . it.' " (*Id.* at p. 1265.)  The Court of Appeal found that the prosecutor had misrepresented the reasonable doubt standard, explaining that "[t]he presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence.  It invites the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Id.* at p. 1267.)  Additionally, the "prosecutor's puzzle analogy" contained a "quantitative component," in that it suggested that six of eight pieces (that is, 75 percent of the pieces) were enough to overcome the reasonable doubt standard.  (*Id*. at pp. 1267–1268.)

In this case, by contrast, the trial court's scales-of-justice analogy did not invite the jury "to guess or jump to a conclusion." (*People v. Katzenberger*, *supra*, 178 Cal.App.4th at p. 1267; cf. *Centeno*, *supra*, 60 Cal.4th at p. 669 [criticizing

"[t]he use of an iconic image like the shape of California or the Statue of Liberty," which "necessarily draw on the jurors' own knowledge" and "trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion"].)  Further, in each colloquy challenged by defendants, the court advised that there is "no number we assign to this and no percentage," or gave a similar advisement to that effect.

In short, we do not believe that the trial court's comments on the reasonable doubt standard several months before trial were such that they could have had any impact on the jury's deliberations.  Given the proper instructions repeatedly provided during trial, there is no "reasonable likelihood that the jury understood the instructions to allow conviction based on" insufficient proof.  (*Victor*, *supra*, 511 U.S. at p. 6.)  We do, however, reiterate that "modifying the standard instruction [on reasonable doubt] is perilous, and generally should not be done . . . ."  (*Freeman*, *supra*, 8 Cal.4th at p. 504; cf. *Sullivan v. Louisiana* (1993) 508 U.S. 275, 282 [erroneously instructing on reasonable doubt is structural error requiring automatic reversal].)

### 2. Aiding and abetting

Defendants next argue that the trial court's instructions concerning aiding and abetting liability were erroneous, and that the error requires us to set aside Michaud's conviction for the oral copulation of April Doe, and both defendants' convictions for the first degree murder of Samson.  We find no reversible error.

### a. Background

The evidence adduced at trial did not reveal whether Daveggio, Michaud, or both, had committed the physical acts that caused Samson's death.  The prosecutor argued that both defendants were, however, guilty of first degree murder, because each was liable in any event for aiding and abetting the actual

63

killer. The prosecution also raised the question of aiding and abetting liability in connection with the oral copulation count concerning April Doe: Although the trial evidence showed that Daveggio, and not Michaud, orally copulated April Doe, the prosecutor argued that Michaud was nevertheless liable because she had aided and abetted Daveggio's misconduct.

The trial court instructed the jury on general principles of aiding and abetting liability in accordance with the then-current version of CALJIC No. 3.00, which provided, in pertinent part: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. *Each principal, regardless of the extent or manner of participation is equally guilty*. Principals include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission or attempted commission of the crime." The court further charged the jury with CALJIC No. 3.01, which added, as relevant here: "A person aids and abets the commission or attempted commission of a crime when he or she, [¶] 1. With knowledge of the unlawful purpose of the perpetrator and [¶] 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [*sic*] [¶] 3. By act or advice aids, promotes, encourages or instigates the commission of the crime."

Immediately after reading those instructions, the court added, "You may consider evidence of a defendant's voluntary intoxication and/or mental disease in deciding whether he or she possessed the necessary mental state and/or intent, namely knowledge of the unlawful purpose of the perpetrator and the intent or purpose of committing, encouraging, or facilitating the commission of a crime."

64

### b. Discussion

Defendants contend that it was error for the trial court to instruct with the "equally guilty" language in the former version of CALJIC No. 3.00. They contend that the instruction incorrectly permitted the jury to convict them on the basis of the culpability of the direct perpetrator of the charged crimes, without considering whether they shared the perpetrator's wrongful intent.

As the Attorney General notes, defendants did not raise this objection at trial, although counsel for Michaud did raise a different objection to the "equally guilty" language (namely, that it created tension with the special circumstance instructions, which informed the jury that to find the special circumstances true, it had to find that Michaud was a major participant in the kidnapping or rape by instrument). As we have in prior cases, we will assume, without deciding, that "defendants' challenge to the ' "equally guilty" ' language in [former CALJIC No. 3.00] was not forfeited for lack of objection and reach[] the merits of their claim, as permitted under section 1259." (*People v. Johnson* (2016) 62 Cal.4th 600, 639 (*Johnson*).)

Defendants' argument departs from the premise that "an aider and abettor's criminal liability may sometimes be greater than, or lesser than, that of the perpetrator." (*Johnson*, *supra*, 62 Cal.4th at p. 638.) As we have explained, aiding and abetting liability "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*), italics omitted; see also *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) It is therefore possible for a direct perpetrator and an aider and abettor to be guilty of different degrees of the same offense, depending on whether they harbored different mental states. For example, we held in *McCoy* that a defendant who aided and abetted a fatal shooting could be convicted of first degree murder, even if the shooter himself,

who argued he was acting under unreasonable self-defense, might ultimately be found guilty only of the lesser crime of voluntary manslaughter. (*McCoy*, *supra*, at p. 1122.) In other words, if an aider and abettor's "mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*Ibid*.)[13] The Courts of Appeal, following *McCoy*, have also held that "an aider and abettor's guilt may also be *less* than the perpetrator's, if the aider and abettor has a less culpable mental state." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 (*Samaniego*), italics added; see *People v. Nero* (2010) 181 Cal.App.4th 504, 513–518; see also *People v. Concha* (2009) 47 Cal.4th 653, 666 (*Concha*).)

As this court has previously explained, however, former CALJIC No. 3.00 "generally stated a correct rule of law. All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*Bryant*, *supra*, 60 Cal.4th at p. 433, citing Pen. Code, § 31.) But it also "could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding." (*Ibid.*)[14] The

---

**13** We take no position on whether this general rule applies when an aider and abettor intends to commit a nonhomicide offense, and the direct perpetrator is guilty only of a lesser offense. (See *McCoy*, *supra*, 25 Cal.4th at p. 1122, fn. 3.) Nor do we express any view on the scope of other possible exceptions inapplicable here (such as a rule prohibiting a minor for being charged with aiding and abetting statutory rape).

We further note that an aider and abettor may be liable for certain criminal conduct that he or she did not intend to facilitate, based on the so-called "natural and probable consequences doctrine." (*People v. Chiu* (2014) 59 Cal.4th 155, 164.) That doctrine is not at issue in this appeal and could not, in any event, support a conviction for first degree murder. (*Id.* at pp. 166–167.)

**14** To avoid confusion, former CALJIC No. 3.00 was modified in 2010. The "instruction now states in relevant part, 'Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is [equally

*(Footnote continued on next page.)*

question before us, then, is whether there is a reasonable likelihood that the jury might "have been misled in this respect in the present matter." (*Johnson*, *supra*, 62 Cal.4th at p. 640; see also *People v. Nunez* (2013) 57 Cal.4th 1, 44.) To answer that question, we consider the first degree murder and oral copulation charges in turn.

### i.    First degree murder

"[A] defendant may be liable for murder when he possesses the appropriate mens rea and either the defendant or an accomplice [proximately] causes an unlawful death." (*Concha*, *supra*, 47 Cal.4th at p. 660.) "To satisfy the mens rea element of murder, the defendant must personally act with malice aforethought" (*ibid.*; see Pen. Code, § 187, subd. (a)), and does so when he intended the killing (Pen. Code, § 188). "[I]f the intent to kill is formed after premeditation and deliberation," the murder is first degree murder. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653 (*Gonzalez*); see also Pen. Code, § 189; *People v. Delgado* (2017) 2 Cal.5th 544, 571.)

Defendants argue that the jury could not have convicted the aider and abettor of first degree premeditated murder if it believed that the actual perpetrator committed that crime, and that the aider and abettor assisted in its commission, but without premeditation. Any determination that a defendant was an aider and abettor required a conclusion that the defendant intended to further Samson's killing; the court advised the jury (per CALJIC No. 3.01) that in order to find that either defendant was an aider and abettor, the jury had to find that the defendant

---

guilty.] [guilty of a crime.]'  The Use Note indicates that in cases presenting the issue whether the aider and abettor's mens rea suggests his or her guilt may be greater or lesser than that of the actual perpetrator, the court should instruct with the ' "guilty of a crime" ' language instead of ' "equally guilty." ' (Use Note to CALJIC No. 3.00 (Spring 2010 rev.).)" (*Johnson*, *supra*, 62 Cal.4th at p. 640, fn. 5.)

knew of the perpetrator's unlawful purpose and acted with the intent or purpose of committing, encouraging, or facilitating the crime. (Cf. *Johnson*, *supra*, 62 Cal.4th at pp. 640–641.) But while intent to kill establishes express malice (Pen. Code, § 188), it does not itself establish deliberation and premeditation (see, e.g., *People v. Koontz* (2002) 27 Cal.4th 1041, 1080).

That said, "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1166.) And under the circumstances of the case, it is exceedingly unlikely that a jury convinced that one of the defendants was an aider and abettor, but not provided with the "equally guilty" language, would have reached a different result regarding premeditation. As noted, Daveggio conceded that the jury could find him guilty of first degree murder; his theory of defense was that jury could not return a true finding as to the special circumstances because he and Michaud kidnapped Samson for the sole purpose of killing her. Michaud, for her part, adopted Daveggio's argument that the kidnapping was incidental to the murder. Her primary defense was that she was controlled by Daveggio and did not voluntarily act in concert with him. But even had the jury credited her theory, Daveggio's control over her would not have negated the conclusion that she aided in the crime after "at least a brief period of deliberation and premeditation"—which, again, "is all that is required." (*Ibid*.) And here, it bears noting, the evidence of deliberation and premeditation was unusually direct: April Doe testified that she discussed going on a "hunting" with both Daveggio and Michaud. April testified that Michaud, in particular, not only asked her if she wanted to join in the "hunting," but became angry when April declined.

68

Michaud suggests in passing that she was acting under duress, but, as she acknowledges, duress is not a defense to a capital crime. (See *People v. Vieira* (2005) 35 Cal.4th 264, 290.) She argues that duress may nevertheless negate the deliberation or premeditation required for first degree murder. This is true only in a limited sense. This court has previously acknowledged that "a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) For example, "[i]f a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder." (*Ibid.*) But this case involves no comparable circumstances. Even if, as Michaud argues, she was "submissive to Daveggio," she points to no evidence suggesting that she acted without reflection.

Finally, even if the jury could have somehow found that an accomplice to Samson's murder had not premeditated the killing, the jury was also told that it could find defendants guilty of first degree murder based on the felony-murder doctrine. "Felony-murder liability does not require an intent to kill, or even implied malice . . . ." (*Gonzalez*, *supra*, 54 Cal.4th at p. 654.) Instead, under that doctrine, "when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. If the felony is listed in [Penal Code] section 189, the murder is of the first degree . . . ." (*Ibid*.) Rape and kidnapping are listed felonies. (See Pen. Code, § 189.) The jury found true, with respect to each defendant, the special circumstance that Samson's killing "was committed while the defendant . . . was engaged in and an accomplice in the commission, the attempted commission and the flight thereafter of a felony, to wit: KIDNAPPING, a violation of section 207 of the Penal Code . . . ." This alone establishes defendants' guilt of first degree

murder. Accordingly, there was no reversible error here. (See *People v. Bacigalupo* (1991) 1 Cal.4th 103, 125 [any error in refusing requested instructions regarding premeditation was harmless because robbery special circumstance finding meant "the murder verdicts [were] not dependent on findings that the killings were deliberate or premeditated"]; *People v. Sedeno* (1974) 10 Cal.3d 703, 721; cf. *People v. Covarrubias* (2016) 1 Cal.5th 838, 905 (*Covarrubias*) [declining to decide whether "a jury should be permitted to find an aider and abettor less culpable than the actual perpetrator of the target crimes" because "[t]he felony-murder and conspiracy verdicts completely eliminate the possibility that defendant could have been convicted of anything less than first degree murder"].)

### ii. Oral Copulation

Michaud also argues that her conviction for oral copulation with a person under 18 years of age must be set aside because of the "equally guilty" instruction. As noted, there was evidence that at least one of the defendants (Daveggio) was a direct perpetrator of the oral copulation of April Doe, and that the other (Michaud) was not. Michaud also notes that the jury requested a read-back of part of April's testimony; asked whether physical contact was "necessary" to convict her of this offense, or whether Michaud could "be found to be a principal by aid and abet"; and was reinstructed with CALJIC No. 3.00.

This argument lacks merit. As noted, the court's aiding and abetting instructions (per CALJIC No. 3.01) made clear that Michaud could be convicted as an aider and abettor only if she intended to commit, encourage, or facilitate Daveggio's criminal acts. And there are no differing degrees of the crime of oral copulation based on different mental states. There is thus no possibility that the jury might have found the two defendants "guilty of different crimes" based on

70

their different mental states, but for potential misinterpretation of former CALJIC No. 3.00's "equally guilty" language. (See *Bryant*, *supra*, 60 Cal.4th at p. 433.) Finally, and in any event, we note that ample evidence supported the jury's conclusion that Michaud did intend to commit, encourage, or facilitate Daveggio's criminal acts, including April's testimony that "Michelle came and sat next to me. . . . She told me that when my dad got out of the shower he was going to have oral sex with me," and April's further testimony that at some point *during* the assault, "Michelle layed on the floor and gave my dad head."

### 3. *Kidnapping as incidental to the murder*

Defendants next contend that the trial court erred by denying their request for a pinpoint instruction concerning the kidnapping special circumstance allegation. We find no error.

#### a. *Background*

As previously noted, the jury was asked to decide the truth of two special circumstance allegations: kidnapping and rape by instrument. (See Pen. Code, § 190.2, subd. (a)(17)(B), (K).) Before the case was submitted to the jury, the court and the parties discussed the propriety of the relevant pattern instruction, CALJIC No. 8.81.17. Citing *Ario v. Superior Court* (1981) 124 Cal.App.3d 285, the defense proposed that the pattern instruction be modified or supplemented to say: "If you find that the kidnapping was for the purpose of murder, then under the law, murder was not committed while the defendant was engaged in kidnapping. Hence, the special circumstances of murder in commission of kidnapping is not established." The prosecutor objected that defendants' proposed language misstated the law, and the court rejected defendants' request. It explained that the proposed language would erroneously suggest "that any killing that took place while a kidnapping was going on couldn't be a felony murder."

71

The court did, however, recite other language from the *Ario* decision, which the court included (with slight modification) in its oral and written instructions to the jury. Between the pattern instruction, a further instruction requested by the prosecutor, and the language from *Ario* identified by the court, the jury was instructed:

"To find that the special circumstance, referred to in these instructions as murder in the commission of a Kidnapping in violation of Penal Code section 207, or Rape by Instrument, in violation of Penal Code [s]ection 289, is true, it must be proved:

"1. The murder was committed while a defendant was engaged in or was an accomplice in the commission or attempted commission of Kidnapping, or Rape by Instrument; and

"2. The murder was committed in order to carry out or advance the commission of the crime of Kidnapping, or Rape by Instrument, or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the Kidnapping, or Rape by Instrument was merely incidental to the commission of the murder.

"[Court's addition:] Either one or both of the felony murder special circumstances may be found to be true only if the evidence demonstrates that the felony was for some independent purpose other than merely to facilitate the crime of murder. If the kidnapping or the rape by instrument was merely incidental to the murder, then the felony murder special circumstance is not established.

"[Prosecutor's requested addition:] Concurrent intent to kill and commit an independent felony will support a felony-murder special circumstance."

### b. *Discussion*

Under the law in effect at the time of Samson's murder, the kidnapping special circumstance allegation required proof of an "independent felonious

72

purpose." (*People v. Thompson* (1980) 27 Cal.3d 303, 324; see also Pen. Code, § 190.2, subd. (a)(17)(M) [change in law]; *People v. Brooks* (2017) 2 Cal.4th 674, 734–736 & fn. 8.) Such a purpose existed so long as defendants had "a concurrent purpose to commit both the murder" and the kidnapping. (*People v. Brents* (2012) 53 Cal.4th 599, 609 (*Brents*); see also *People v. Castaneda* (2011) 51 Cal.4th 1292, 1326–1327.) If, by contrast, the kidnapping was "merely incidental to the murder," then the kidnapping special circumstance allegation was false. (*People v. Green* (1980) 27 Cal.3d 1, 61.)

Defendants contend that the trial court erred by denying their request for a pinpoint instruction advising the jury that it could not find the kidnapping special circumstance true if it found "the kidnapping was for the purpose of murder." This claim is unavailing. It is generally true that "[a] criminal defendant is entitled, on request, to a[n] instruction 'pinpointing' the theory of his defense." (*People v. Wharton* (1991) 53 Cal.3d 522, 570.) But a request for a particular instruction may be denied if the instruction is argumentative (*id*. at pp. 570–571), misstates the law (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142), or duplicates other instructions (*id*. at p. 1144). Here, defendants' proposed instruction misstated the law insofar as it suggested that the jury could not render a true finding if it found that the "kidnapping was for *the* purpose of murder"; as the court correctly instructed the jury, "a concurrent purpose to commit" both murder and kidnapping would support a true finding (*Brents*, *supra*, 53 Cal.4th at p. 609). In any event, to the extent the purpose of the pinpoint instruction was to inform the jury of the "independent felonious purpose" requirement, the point was adequately conveyed by the instruction the court gave: "Either one or both of the felony murder special circumstances may be found to be true only if the evidence demonstrates that the felony was for some independent purpose other than merely to facilitate the crime of murder. If the kidnapping or the rape by instrument was

merely incidental to the murder, then the felony murder special circumstance is not established."

### 4. Calling attention to Michaud's decision not to testify

Michaud argues that the trial court committed reversible error by calling attention to her decision not to testify during the guilt phase. We find no error.

#### a. Background

Neither defendant testified during the trial's guilt phase. The trial court advised that it would instruct the jury with CALJIC No. 2.60, which provides: "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way." Michaud objected that the instruction would call attention to her decision not to testify; Daveggio requested that the instruction be given. The court gave the instruction.

#### b. Discussion

The Fifth Amendment of the federal Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) That provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615; accord, *People v. Thompson*, *supra*, 1 Cal.5th at p. 1117.) But as the high court explained in *Lakeside v. Oregon* (1978) 435 U.S. 333 (*Lakeside*), "a judge's instruction that the jury must draw *no* adverse inferences of any kind from the defendant's exercise of his privilege not to testify is 'comment' of an entirely different order"—and does not violate the constitutional privilege against self-incrimination. (*Id.* at p. 339.)

74

Michaud nevertheless faults the trial court for giving the instruction over her objection. She notes that, after *Lakeside* was decided, we explained that "the purpose of the instruction is to protect the defendant, and if the defendant does not want it given[,] the trial court should accede to that request, notwithstanding the lack of a constitutional requirement to do so." (*People v. Roberts* (1992) 2 Cal.4th 271, 314 (*Roberts*); see also *Lakeside*, *supra*, 435 U.S. at p. 340 [state law may forbid courts from giving such instructions over a defendant's objection].)

The central problem with this argument is that, while Michaud objected to CALJIC No. 2.60, Daveggio asked that the instruction be given. "[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." (*Carter v. Kentucky* (1981) 450 U.S. 288, 300.) If Michaud means to suggest that our state-law holding that courts should honor requests to omit CALJIC No. 2.60 displaces Daveggio's federal constitutional right to a no-adverse-inference instruction, the suggestion is incorrect. (See U.S. Const., art. VI, cl. 2 [Supremacy Clause].)

In any event, any error was plainly harmless beyond a reasonable doubt. "We must assume that the jury followed the admonition not to take into account defendant's failure to testify. Under that view, it is inconceivable that the giving of the instruction led to a less favorable outcome for defendant." (*Roberts*, *supra*, 2 Cal.4th at pp. 314–315; cf. *Lakeside*, *supra*, 435 U.S. at p. 340 [it is "very doubtful" that, absent a no-adverse-inference instruction, "the jurors [would] have not noticed that the defendant did not testify"].)

### E. Prosecutorial Misconduct

Defendants contend that the attorney who prosecuted the case, Angela Backers, engaged in several instances of misconduct, primarily during her opening statement at the guilt phase.

75

A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made "a timely and specific objection at trial" and requested an admonition. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*); see also *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [claim of error forfeited where objection was made and sustained, but no admonition was requested]; *People v. Maciel* (2013) 57 Cal.4th 482, 528 [rule applies to challenge to playing of videotape].) " 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' [Citation.]" (*Seumanu*, at p. 1328.) Consistent with that purpose, "[a] court will excuse a defendant's failure to object only if an objection would have been futile" (*People v. Jackson* (2016) 1 Cal.5th 269, 349), or if an admonition would not have mitigated the harm caused by the misconduct (*ibid.*; see *People v. Valdez* (2004) 32 Cal.4th 73, 125, 133). " '[T]he absence of a request for a curative admonition' " may likewise be excused if " ' "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request." ' " (*Seumanu*, at pp. 1328–1329.) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

As we have previously explained, "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).) Such error occurs, as a matter of state law, when a prosecutor "engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict."

(*People v. Lightsey* (2012) 54 Cal.4th 668, 718.) Federal constitutional error occurs only when the prosecutor's actions "comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law." (*Ibid.*) "In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35 (*Blacksher*).) Under federal law, relief is not available if "the challenged conduct was . . . harmless beyond a reasonable doubt." (*Ibid.*)

We limit our discussion to the claims of error that were at least arguably preserved by an objection and request for an admonition, as well as claims as to which defendants colorably argue that objection would have been futile. (Cf. *People v. Fuiava* (2012) 53 Cal.4th 622, 681 (*Fuiava*).) Because defendants' theories of futility are interwoven with their arguments on the merits, our discussion of those futility theories is as well.

### 1. Opening statement

Defendants complain of several comments made by Ms. Backers during her opening statement. "[W]hen [a] claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

### a. Description of Aleda Doe incident

Much of Ms. Backers's initial description of the Aleda Doe incident was a dry recitation of what the evidence would show. Other portions, however, include the following statements, which were interspersed between others:

"Now, I would like to tell you about a little Salvadorian woman by the name of Aleda Doe who fell prey to the defendants on September 29th."

"Aleda Doe is a beautiful young 21-year-old Salvadorian woman who came to America to build a life for herself and [her] family."

"Michaud drove the van away with Aleda as their prisoner, their victim."

"[Daveggio] forced himself on Aleda all the way from Reno to Auburn, California. He assaulted this little four-foot-ten girl for 93 miles. [¶] . . . [¶] He forced this little girl to touch his testicles with her hands. . . . [¶] Daveggio shoved his fingers into Aleda's vagina. He shoved them into Aleda's rectum. He raped Aleda by shoving his penis into Aleda's vagina. [¶] The driver, Michelle Michaud, kept glancing back over her shoulder to watch. While Daveggio was on top of Aleda and forcibly raping her, Aleda pulled on Michaud's hair to try to get help, but she refused to come to her aid. [¶] During this rape, Daveggio did not ejaculate at this point."

"While Daveggio forced Aleda to orally copulate his penis, he kissed her on the neck. He now took his penis out of her mouth and began masturbating. Daveggio ejaculated in Aleda's face. He ejaculated on her face and in her hair."

"At this point, Aleda knew they were going to kill her so she started begging for her life. Begging. . . . [¶] . . . Daveggio refused to take Aleda back to Reno because he said she might do something stupid. Aleda continued to beg. That is fine. You can drop me off right here. She just wanted to live. Then Daveggio said to Michaud: So, Mickey, what do you think? [¶] Michaud answered: well, let me think about it for ten minutes. [¶] *While Michaud thought about whether Aleda would live or die,* Daveggio allowed Aleda to get dressed."

After Ms. Backers reached a stopping point in her description of the incident, the following colloquy occurred:

"THE COURT: All right. Ladies and Gentlemen, we will take a recess at this time. . . .

"[DEFENSE COUNSEL]: May we approach the bench?

"(Whereupon, the following proceedings were held at sidebar.)

"[DEFENSE COUNSEL]: Your honor, I will object to some of Ms. Backers' opening comments. The detail that she is presenting on Aleda Doe is only calculated to inflame the jury. The court has allowed the Aleda Doe testimony to come in for the purpose of similar and [*sic*] identity. [¶] There is no evidence that I can recall that this kind of conduct occurred to the victim. There is no evidence of ejaculation on Samson, the 187 victim. The court said that it can come in because it is a similar for identity. None of this detail has been indicated to have occurred to the 187 victim. It is only calculated for the prosecution to try to have the jury be inflamed and speculate that this sort of thing might have happened to Ms. Samson. [¶] So I know what the court's ruling is on the evidence, but I want to be clear that from its inception Ms. Backers is attempting to inflame this jury. [¶] . . . [¶]

"THE COURT: I have a bigger problem with the way it is being presented. I mean, I have about reached the limit: As Michelle thought about whether she lives or dies? You have no damned idea of what Michelle was thinking about. That is argument. That is an inference as to what was going on as to what the initial plan was. I mean, you are arguing the case.

"MS. BACKERS: Excuse me. That is what the victim is going to testify to.

"THE COURT: She doesn't know what Michelle Michaud was thinking about.

"MS. BACKERS: She knows that the defendant Daveggio said he was leaving it up to Michelle.

79

"THE COURT: Leaving what up? That is an inference.

"MS. BACKERS: That was the conversation she heard.

"THE COURT: That is an inference, Ms. Backers. I am putting you on notice that if this continues, I will start making objections while you are doing it. That is argument. What Michelle was thinking is argument. It is an inference that can be drawn from the facts. I will let you argue that, but you are not going to do it in opening statement. This is an opening statement. This is not closing argument. And you are arguing the case and you know better. And I am trying to get everybody to get this thing started, but I am not a happy camper with the way this is going. So you are on notice that you better start presenting this stuff as an opening statement and not [a] closing argument.

"[DEFENSE COUNSEL]: I was also going to ask, since she has been talking the better part of an hour and still hasn't talked about the case charged—

"THE COURT: She can present it any way she wants as long as it is not argument.

"[DEFENSE COUNSEL]: But I think the jury should be reminded that so far none of this is charged conduct.

"THE COURT: She was going to do that and then you objected.

"[DEFENSE COUNSEL]: No.

"THE COURT: Actually, [a different defense attorney] started. [¶] I will put everybody on notice this better start sounding like an opening statement.

"(Recess taken.)"

This was not the only time the court sua sponte criticized Ms. Backers, at sidebar, complaining that she was arguing the case during opening statement.

Defendants' objection and request for an admonition preserved their claim that the prosecutor's description of the Aleda Doe incident was "only calculated to inflame the jury." The stated basis for the objection was that the Aleda Doe

80

evidence was admitted "because it is a similar for identity," and that there was no evidence Samson had suffered any similar mistreatment. In essence, counsel reasoned that the evidence was admitted as proof of identity, but was presented in a way that exceeded the justification for its admission. But as previously explained, the Aleda Doe evidence was also properly admitted under section 1108 to show propensity. Describing evidence relevant for that purpose was not misconduct.

Although defendants were not quite as explicit on the point, we will assume they also preserved an objection to the descriptions that Ms. Backers used (as opposed to the evidence she described)—such as "little Salvadorian woman" and "beautiful young 21-year-old Salvadorian woman" and "a little four-foot-ten girl." Appeals to sympathy for the victim fall outside the range of permissible argument. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) The descriptions in question were, however, "mild and fleeting," (*People v. Winbush*, *supra*, 2 Cal.5th at p. 480), and before the case was submitted, the court charged that the jury "must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences." We presume the jury followed that instruction (see *People v. Martinez* (2010) 47 Cal.4th 911, 957 (*Martinez*)), and see no reasonable likelihood that Ms. Backers's descriptions of Aleda improperly inflamed the jury.

Defendants attempt to leverage this colloquy (and related instances of the court objecting to Ms. Backers arguing during opening statement) to excuse *all* of their failures to object and request admonitions. Defendants contend that objecting to other alleged misconduct would have been futile, because the "record . . . is replete with the trial court's repeated efforts to rein in the prosecutor's

81

multiple attempts at arguing the case in opening statement." We will assume for the sake of argument that the trial court was unable to restrict the prosecutor's argument, and we further assume that an inability to prevent argument during opening statement excuses a defendant's failure to object to all forms of misconduct. (But cf. *People v. Bain* (1971) 5 Cal.3d 839, 849 [evaluating effect of "the misconduct of the prosecutor *objected to by defense counsel*" even where court had "allowed the trial to be conducted at an emotional pitch" (italics added)].) This argument nevertheless fails.

Defendants' reasoning confuses two concepts: (1) whether the trial court could stop the prosecutor from committing misconduct, and (2) whether the trial court could cure or mitigate the prejudice caused by any misconduct. If improper argument was inevitable, but any harm inflicted by that argument could have been cured, then a failure to object still generally works a forfeiture. (Cf. *Seumanu*, *supra*, 61 Cal.4th at p. 1328 [objection requirement exists primarily so court has an opportunity " 'through admonition of the jury, to correct any error and mitigate any prejudice' "].) Of course, there may be cases in which an objection and request for admonition would have been futile, or even affirmatively harmful, such as when a trial court appears disposed to overrule additional objections, and perhaps even to criticize defense counsel in front of the jury. (See *Hill*, *supra*, 17 Cal.4th at pp. 820–822.) But defendants fail to show that this is such a case. And as a practical matter, if a prosecutor's conduct draws frequent objections and admonitions, the prosecutor might change that conduct going forward. Perhaps not coincidentally, the record reveals a long stretch of opening statement following this colloquy in which no objection was raised by the court or the four defense counsel (and in which, even on appeal, no prosecutorial misconduct is alleged to have occurred).

82

Defendants could have argued that the grounds on which the trial court objected sua sponte were grounds defendants were free to raise on appeal, notwithstanding their failures to request admonitions. (See *People v. Collins* (2010) 49 Cal.4th 175, 226–227; see also *People v. Peoples* (2016) 62 Cal.4th 718, 801 (*Peoples*); but see *People v. Harris* (2013) 57 Cal.4th 804, 858 [trial court interjected, objection nevertheless forfeited because no admonition requested].) Defendants do not appear to have done so. In any event, the remaining asserted errors are harmless beyond a reasonable doubt. Particularly given the strong evidence of defendants' guilt, the trial court's apparent concern that the prosecutor was arguing the case too early was not of consequence. Likewise, the trial court's briefly stated concern that Ms. Backers was "kind of testifying" (when Ms. Backers explained how *she* had an expert review certain findings) was immaterial. Finally, we agree with defendants that after the initial colloquy reprinted above, Ms. Backers continued to make statements designed to appeal to the jury's emotions, sympathy, and sentiment, such as describing the scene when Vanessa Samson's brother appeared at the police station and "could see that everyone was staring at him." (See, e.g., *People v. Fields* (1983) 35 Cal.3d 329, 362 [misconduct to appeal to sympathy for victim in guilt phase]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [misconduct to ask jury to suppose the crime was committed against their children].) As we have repeatedly made clear, a prosecutor may not " 'make arguments to the jury that give it the impression that "emotion may reign over reason," [or] present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.) But once again, the jury was instructed that it "must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion,

or public feeling."  The jury's careful consideration of the April Doe incident suggests that the jury understood and followed that instruction.

### b. Crying

Defendants complain that the prosecutor cried, or was "breaking up," during her opening statement.  The argument centers on this exchange:

"MS. BACKERS:  [T]hat night, . . . April [and] Jamie . . . all ended up spending the night there [at the Candlewood] with Michelle Michaud.  [¶]  That same Wednesday night, the night before Thanksgiving in the same town of Pleasanton, a different scene was taking place in the Samson home.  Vanessa Samson's family was preparing for their Thanksgiving the next day.  [¶]  On Thanksgiving morning, Thanksgiving Day, Jamie and April Daveggio were going to celebrate Thanksgiving with their mother and their father.  So A[n]nette Carpenter invited James and Michelle to celebrate a family meal with them at her home in Dublin.  [¶]  When they were in her bedroom, before Thanksgiving dinner, April was standing there with her father.  She was 16.  And her father was playing with his gun, fondling it in a particular way, which she'll describe for you.  And he asked her if she wanted to hold it.  He handed it to her and right when he handed her the gun, her mother called her down for dinner.  They went down and had Thanksgiving dinner together.

"[DEFENSE COUNSEL]:  Excuse me, your honor, may we approach the bench?

"THE COURT:  Sure.

"(Whereupon the following proceedings were held at sidebar.)

"[DEFENSE COUNSEL]:  I can't see the District Attorney's face, but from her tone of voice I don't know whether she's crying or not.  I don't know if the court can observe it.

"MS. BACKERS:  No, I'm not.

84

"[DEFENSE COUNSEL]: She started breaking up.

"[ADDITIONAL DEFENSE COUNSEL]: If we are going to start contrasting with what happened with Vanessa —

"THE COURT: I don't want to do that, Ms. Backers.

"MS. BACKERS: No.

"THE COURT: I don't want anything about what's going on in the Samson home.

"MS. BACKERS: I'm talking about what happened in the Daveggio household.

"THE COURT: You said something very different was going on in the Samson house and that's inappropriate, so stay away from that kind of stuff.

"MS. BACKERS: Okay, I'm talking about the Dublin household.

"[DEFENSE COUNSEL]: You were breaking up.

"MS. BACKERS: No, not at all.

"[DEFENSE COUNSEL]: Well, I couldn't tell."

Defense counsel's failure to request an admonition forfeited any claim of error regarding this exchange. Defendants claim, however, that any further efforts were unnecessary. Because the trial court "made no effort to inquire into the defense claim that the prosecutor was either crying or breaking up," they reason, further efforts "would have been futile."

If defendants mean that any request for the trial court's intervention would have been futile because the court simply did not care whether the prosecutor was crying, their argument is dubious. Defense counsel said, "I don't know whether she's crying or not. I don't know if the court can observe it." When the prosecutor assured him that she was not doing so, counsel responded, "Well, I couldn't tell." The fairest reading of the record is that, at sidebar, the trial court saw that the prosecutor was *not* crying, or at the least, did not see her crying. That

85

we have to speculate points in favor of a finding of forfeiture. (Cf. *Bryant*, *supra*, 60 Cal.4th at p. 371 ["Bryant's failure to secure a ruling on his motion forfeits any appellate claim of error."].)

Ultimately, since the record does not support the contention that the prosecutor actually cried, we must reject defendants' claim of prosecutorial misconduct. Further, if defendants mean to argue that the trial court's decision not to ask the prosecutor whether she was crying excuses *all* of their failures to object or request admonitions, their argument is not colorable. For one thing, claims of futility must generally be tied to the type of objection that would have been futile. (See *Peoples*, *supra*, 62 Cal.4th at p. 797 [rejecting futility argument based on "generalized accusation of unfairness" made without "greater specificity as to why this particular objection would have fallen upon deaf ears"]; *People v. Thomas* (2012) 54 Cal.4th 908, 939 ["There is no support for defendant's assertion on appeal that the trial court necessarily would have overruled objections *based on the specific grounds* he now raises on appeal . . . ." (Italics added.)].) In any event, this version of the argument rests on a belief that because the court did not follow up regarding this claim of misconduct (which, again, would not have been necessary if the court saw that the prosecutor was not crying), then the court must have been hostile to further defense objections and requests, rendering those objections and requests futile. Yet defendants' prior theory of futility was based on the fact that the trial court objected *on its own* to what it perceived to be misconduct. There is no reason to think the court would not have seriously considered further objections. (Cf. *Fuiava*, *supra*, 53 Cal.4th at p. 680 [rejecting claim of futility where "the trial court at times interposed its own objections to what it perceived as improprieties by the prosecutor"].) Indeed, the claim of error discussed below (regarding rope-related evidence) concerns an incident that

occurred after the supposed crying—and when defendants objected, the court sustained the objection and gave a requested admonition.

Defendants might also be understood to argue that any objection or request for an admonition would have been futile because, "given the multiple instances in which the prosecutor argued the case during opening statement and given the prejudicial nature of that argument, the curative effect of any admonition is questionable." Not so. We presume that jurors follow instructions (see, e.g., *People v. Shazier*, *supra*, 60 Cal.4th at p. 150), even where supposedly "improper inflammatory attacks" are at issue (*Samayoa*, *supra*, 15 Cal.4th at p. 842; cf. *People v. Redd* (2010) 48 Cal.4th 691, 753; *People v. Rundle* (2008) 43 Cal.4th 76, 193–194; *People v. Osband* (1996) 13 Cal.4th 622, 718). Indeed, as noted above, we presume that jurors follow instructions not to be swayed by sympathy or prejudice. (See *Martinez*, *supra*, 47 Cal.4th at p. 957.) Nothing suggests that— if Ms. Backers was crying, and the jury observed her doing so—such an instruction would have been ineffectual here.

### c. Rope-related evidence

During her opening statement, the prosecutor discussed the rope-related evidence. The following transpired:

"MS. BACKERS: When you take the length that comes in a normal package from the manufacturer, they give you extra footage. It is about 48 feet, little bit more. It is supposed to be 45, but they always give you extra. And when you take the length of what you purchase at the store, and you take the length of the rope that was recovered on the white towel in the right, front passenger floorboard, and you take the length of the rope that was recovered in Michaud's front pocket, there is eight feet missing. And that is why when we did the exemplar restraints we used approximately two feet for each of the restraints that were at the four slits.

87

"[DEFENSE COUNSEL]: Your honor, can we approach the bench?

"(Whereupon, the following proceedings were held at sidebar.)

"[DEFENSE COUNSEL]: I am objecting to the use of restraints. There is no evidence that that van was used for restraints.

"THE COURT: Yeah. I was going to say you have to stay away from that until you argue. That is an inference. They are going to argue it is not, and you will argue it is.

"MS. BACKERS: That is fine.

"THE COURT: I will tell the jury to disregard the use of restraints. You want me to highlight that?

"[DEFENSE COUNSEL]: Yeah. We are going too far afield.

"(Whereupon, the following proceedings were held in open court.)

"THE COURT: All right. [¶] Ladies and Gentlemen, we are kind of going over the line into an area of argument at this time. So I will instruct you at this time to disregard Ms. Backers' choice of words in using the word 'restraints' as it relates to those ropes. There is no evidence of that at this point and that is an inference that may be argued later on, but opening statements are not for argument so you will disregard those terms."

The objection and request for an admonition preserved any claim of error, but the admonition given by the court rendered any error harmless. (See also *ante*, part II.E.1.a. [discussing harmlessness].) Notably, any error here was in making the argument too early, not in making an argument unsupported by the evidence. While no forensic evidence indicated that Samson was restrained, restraints would help to explain the absence of defensive wounds; an expert testified that it was possible for a person to be restrained without any marks being visible; there was ample rope available to defendants; and the slits in the carpet had no plausible purpose except facilitating restraint using the anchor bolts. The jury was, of

88

course, free to reject this argument.  But it would not have been misconduct for the prosecutor to make the argument at the appropriate time.

### d. Ensuring Samson "couldn't tell"

The prosecutor's opening statement concluded with the following exchange:

"MS. BACKERS:  The last thing I wanted to show you about the evidence in this case is a videotape.  It is a videotape that was made by the Alpine County Sheriff's Department of the recovery of Vanessa. . . .  [¶]  The video will show you the black rope and it will show you both ends of the black rope.  It will show you an end of the black rope that is in a twisted curved position.  Then the video will take you to the other end of the black rope and you will see the clump of dark hair that is on the end of that black rope right next to Vanessa's body.  And it will show you the condition of her socks, her shoes, her open zipper, and the position of her body.  [¶]

"(Whereupon, Exhibit 79-A was played in open court.)

"MS. BACKERS:  Ladies and Gentlemen, James Daveggio and Michelle Michaud left Vanessa on that snowy embankment.  They made sure that she couldn't tell."

The court asked to see counsel at sidebar, to determine whether defendants intended to give an opening statement.  Both reserved the right to do so at a later time.  The following colloquy then occurred:

"[DEFENSE COUNSEL]:  By the way, for the record, the last line is absolutely objectionable.

"THE COURT:  It is.

"[DEFENSE COUNSEL]:  And I would like the jury told that is inappropriate.  [¶]

"THE COURT:  Okay.  Anything you want to say?

89

"MS. BACKERS: Yes. That I am allowed to prove intent. And from the other girls did tell [*sic*], for that very reason, and that is intent to kill.

"THE COURT: Probably is, but the way you did it is it is argument stuff. That is the problem. Rather than draw attention to it, I will let it go.

"DEFENSE COUNSEL: Okay.

"THE COURT: All right.

"DEFENSE COUNSEL: Will you at least remind the jury that nothing that has been said so far is evidence?

"THE COURT: Yeah. I will do that right before we start. Everything you heard during opening statement is not evidence and now we will take testimony because now you will have notebooks and you can take notes.

"[DEFENSE COUNSEL]: I would request you do it now since we are reserving our opening statements rather than this afternoon while it is still fresh."

The court did so, advising the jury that "everything said in opening statements is not evidence and that is why you did not have notebooks and so forth. [¶] We will start testimony this afternoon. We will give you notebooks then so you can take notes if you want to."

The fact that Samson's body was recovered was evidence to be adduced. The inference that defendants killed her, and suggestion that they did so to ensure Samson "didn't tell," was inference the trial court found objectionable. We have no reason to doubt that any prejudice caused by those statements was cured by the court's admonition that the prosecutor's opening was not evidence. The trial court was not presented with any other specific basis on which the prosecutor's conduct was objectionable; accordingly, none is preserved for our review. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 894.)

## 2. *Closing argument*

None of defendants' objections concerning Ms. Backers's closing argument is preserved for our review. Even if we were to address the objections, however, we find no reversible error. Defendants challenge Ms. Backers's argument that Samson had been restrained, but that, as already noted, was not misconduct. They also challenge Ms. Backers's statements along the lines of: "We are gathered here for one reason, and that is for Vanessa Samson." As previously explained, these sorts of appeals to the jurors' sympathies are not proper argument. But for the reasons given above, we conclude the errors were harmless beyond a reasonable doubt.

## F. Denial of Rebuttal

Daveggio contends that the trial court abused its discretion, and violated his constitutional rights, by denying his request for five minutes to rebut Michaud's closing argument at the guilt phase. This contention is meritless.

## 1. *Background*

Michaud's closing argument "adopt[ed]" some of the arguments made in Daveggio's closing statement, deeming the theory that Samson was kidnapped solely for purposes of murder to be "the reasonable choice as to what occurred." Among other things, however, her closing urged that she "was under the domination and control of Mr. Daveggio," and asked the jury to consider whether, "[i]f somebody is dominated or controlled by somebody, are they voluntarily acting in concert."

At the end of Michaud's argument, Daveggio requested "probably five or ten minutes" of rebuttal, purporting to renew an earlier request. Michaud objected: "There is an order to these things." After advising the parties that it would "think about" the issue, the court ultimately denied the request for rebuttal.

91

## 2. *Discussion*

Trial courts have broad discretion to control the sequence of closing argument. (See, e.g., Pen. Code, § 1044; *Herring v. New York* (1975) 422 U.S. 853, 862.) Daveggio concedes as much. He contends, however, that the trial court abused its discretion here, because its ruling left him "unable to rebut" Michaud's efforts to "shift[] the blame to him," thus "depriv[ing] [him] of the chance to address arguments made against him."

Daveggio, however, could not have been surprised by the content of Michaud's argument. The suggestion that Michaud was a good person who was corruptly influenced by Daveggio arose long before her closing argument. For example, Michaud called an expert witness who testified that Michaud had a propensity to "be controlled by someone else in a relationship." She also called a lay witness who testified that after Daveggio moved in, Michaud "quit caring about herself." The suggestion was so clear that Daveggio called a rebuttal witness, before closing arguments began, from whom he elicited testimony that Michaud had manipulated Daveggio in the past.

We also note that Michaud's effort to "shift[] the blame" to Daveggio did not undermine the theory urged in his closing statement. Recall that while the jury was required to determine whether Michaud was guilty of the three oral copulation charges, Daveggio had already pleaded guilty to those crimes. With respect to Daveggio, the jury needed only to determine his responsibility for the murder, if any, and the truth of the alleged special circumstances. Daveggio admitted that the jury could "find a first-degree murder against [him]" and trained his defense on the special circumstances. In particular, he argued—with apparent support from Michaud's closing argument—that he kidnapped Samson for the sole purpose of killing her, and that Samson was not raped by instrument. Whether Daveggio influenced Michaud to participate in that kidnapping and murder was

92

(and remains) beside the point. To be sure, courts should exercise their discretion with great care in capital cases, not least those in which one defendant attempts to shift blame to another. But there was no error here, let alone one with any conceivable impact on the outcome of the trial.[15]

### G. Cumulative Error

Defendants complain of cumulative error. We have assumed—mostly for argument's sake, and often in the alternative to a finding of no error or that defendants likely failed to preserve an objection—that the following errors occurred: (i) some of the ammunition and crossbow evidence was inadmissible; (ii) the "equally guilty" instruction was erroneous as applied to premeditated murder; (iii) the trial court erred by giving a no-inference instruction regarding defendants' decision not to testify; and (iv) the prosecutor committed misconduct during her opening and closing statement. Again assuming for the sake of argument that these were, in fact, errors, they are cumulatively harmless beyond a reasonable doubt, and did not undermine the fundamental fairness of defendants' trial. (Cf. *Hill*, *supra*, 17 Cal.4th at p. 847.) The evidence in this case was overwhelming. In particular, the evidence that Samson's DNA was found on the tip of a modified curling iron inside Michaud's van made clear that defendants had abducted Samson, and that the kidnapping was not merely incidental to Samson's murder. That alone supports the convictions for first degree murder and the true findings on the kidnapping special circumstance. Although there was less evidence pertaining specifically to the rape-by-instrument special circumstance, we see no reasonable possibility that the jury would have reached a different result in the absence of the errors found or assumed.

---

**15** If Daveggio means to suggest that the denial of rebuttal at the guilt phase may have affected the jury's penalty determination, it suffices to say that he had ample time to address Michaud's theory during the penalty phase.

Further, any errors regarding the Sharona and April Doe counts were also harmless beyond a reasonable doubt.  The evidence concerning those offenses was strong as well, and none of the found or assumed errors either individually or cumulatively undermined the fundamental fairness of the trial as to those counts.

## H.  Constitutionality of California's Death Penalty Scheme

Defendants raise several objections to the constitutionality of California's death penalty scheme.  We decline to reconsider our existing precedent and reject these objections, on the merits, as follows:

"The statutory special circumstances that qualify a defendant for the death penalty ([Pen. Code,] § 190.2) are not unconstitutionally overbroad."  (*People v. Eubanks* (2011) 53 Cal.4th 110, 153.)  Further, "[f]actor (a) of section 190.3, which permits the jury to consider '[t]he circumstances of the crime' in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty."  (*Ibid.*, quoting § 190.3, subd. (a).)  Nor does "[t]he use of restrictive adjectives, such as 'extreme' and 'substantial,' in section 190.3's list of potential mitigating factors . . . render it unconstitutional."  (*Blacksher*, *supra*, 52 Cal.4th at p. 849.)

"Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty."  (*People v. Enraca* (2012) 53 Cal.4th 735, 769.)  Nor is a tie-breaking rule required.  (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1355.)

The trial court need not "instruct the jury that there is no burden of proof." (*People v. McDowell* (2012) 54 Cal.4th 395, 443 (*McDowell*).)  Additionally, "[a] penalty phase jury need not be instructed as to which factors are aggravating and which are mitigating or to restrict its consideration of evidence in this regard." (*Blacksher*, *supra*, 52 Cal.4th at p. 849.)

"Neither the federal nor our state Constitution requires intercase proportionality review."  (*McDowell*, *supra*, 54 Cal.4th at p. 444.)

"The jury's consideration of the defendant's unadjudicated criminal activity as an aggravating circumstance is constitutionally permissible, and the jury need not agree unanimously that the defendant committed the unadjudicated crimes." (*People v. Elliott* (2012) 53 Cal.4th 535, 593 (*Elliott*).)

"California's death penalty law does not violate the federal Constitution's equal protection guarantee by denying capital defendants procedural safeguards that are available to defendants charged with noncapital crimes."  (*Elliott*, *supra*, 53 Cal.4th at p. 594.)  "California does not employ the death penalty as a ' "regular punishment for substantial numbers of crimes" ' [citation], and its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment.  [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 1008.)

### III. CONCLUSION

We affirm the judgment.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**O'LEARY, J.**\*
**POLLAK, J.**\*\*

---

\* Presiding Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
\*\* Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Daveggio

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S110294
**Date Filed:** April 26, 2018

_____

**Court:** Superior
**County:** Alameda
**Judge:** Larry J. Goodman

_____

**Counsel:**

David H. Goodwin, under appointment by the Supreme Court, for Defendant and Appellant James Anthony Daveggio.

Janyce Keiko Imata Blair, under appointment by the Supreme Court, for Defendant and Appellant Michelle Lyn Michaud.

Joseph Schlesinger for California Appellate Project as Amicus Curiae on behalf of Defendant and Appellant James Anthony Daveggio.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Ronald S. Matthias, Assistant Attorney General, Glenn R. Pruden, Catherine McBrien, Sarah J. Farhat and Huy T. Luong, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David H. Goodwin
10153 1/2 Riverside Drive. PMB 793
North Hollywood, CA  91602
(323) 666-9960

Janyce Keiko Imata Blair
1609 Border Avenue
Torrance, CA  90501
(310) 606-9262

Huy T. Luong
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5941